Argued January 13; affirmed February 8, 1949

ROBINSON *v.* LEVERENZ

202 P. (2d) 517

*C. M. Huddleston,* of Corvallis, argued the cause for appellants. With him on the brief was O. Middlekauff, of Corvallis.

*Orval N. Thompson,* of Albany, argued the cause

for respondents. On the brief were T. M. Morris, of Corvallis, and Weatherford & Thompson, of Albany.

Before Lusk, Chief Justice, and Belt, Rossman, Bailey and Hay, Justices.

ROSSMAN, J.

This is an appeal by the defendants from a decree of the Circuit Court in favor of the plaintiffs, which holds that they (plaintiffs-respondents) are the owners in fee simple of two parcels of real property which the complaint describes. The suit was instituted to quiet the respondents' title. The respondents are four in number. Two of them, Henry N. and Dora D. Robinson, are the parents of Clifford E. Robinson, who, with his wife Laura, are the other two respondents. The appellants, who are husband and wife, own a parcel of real property which is immediately north of the parcels described in the complaint.

The appellants present two assignments of error:

1. "The Court erred in rendering its decree in favor of the plaintiffs and against the defendants."

2. "The Court erred in rendering a decree that the plaintiffs are the owners of the real property described."

The following statement contained in the appellants' brief affords a better impression of the issue submitted by this appeal:

"The possession of plaintiffs, as shown by the

evidence, does not establish title in themselves by adverse possession."

The properties involved in this suit are situated in the city of Corvallis. Although the complaint describes two parcels, the title to only one of them is in dispute—a strip, 100 feet long, 30 inches wide at its street end and 45 inches wide at the alley end. The other parcel which the complaint describes is 50 by 100 feet in size, immediately south of the disputed strip. The complaint avers that its owners are the respondents. The answer, referring to the appellants and to the parcel just mentioned, says:

"They deny that the defendants (appellants) have heretofore or do now claim any right, title, or interest in the property first described in the complaint, and do hereby disclaim any and all claim, title or interest thereto, * * *."

Thus the title to the parcel (50 by 100 feet in size) which lies immediately south of the disputed strip is not claimed by the appellants. Upon that parcel and the adjacent disputed strip, the respondents, Henry N. and Dora D. Robinson, have made their home since 1926. Immediately to the north of the disputed strip is the home of the appellants. Their deed calls for a lot 50 by 100 feet in size.

From the foregoing it is seen that the narrow strip is bounded upon the south by a parcel 50 by 100 feet in size which the respondents say they own, and which the appellants do not claim. It is bounded on the north by the home of the appellants. The deeds to both properties describe the properties by metes and bounds; each is 50 by 100 feet in size. If the disputed area belongs to the respondents, their property is 50 feet and 30 inches wide in front and 50 feet and 45

inches wide at the rear. If it belongs to the appellants, their lot is 50 by 100 feet in size; but if it does not belong to them, their lot is less than 50 by 100 feet in size to the extent of the disputed strip. The appellants, in order to prove title to the disputed strip, depend upon their deed. The respondents, in support of their claim to title to the disputed area, depend upon adverse possession. They claim that it began not later than 1902.

For many years a fence has stood along the north line of the disputed tract. There also stands a fence along the south line of the respondents' lot and still another along the alley. The three fences, roughly speaking, assume the form of a U. The disputed strip is within the U. To clarify matters, we shall retrace some steps. The respondents claim title to their 50 by 100-foot lot by virtue of the deeds they possess; they claim title to the contested area by adverse possession. A dwelling house stands within the U, and in it, as we have said, the respondents, Henry N. and Dora D. Robinson, reside. The evidence indicates that they have lived there since 1926, and that the predecessors in interest of the respondent, Henry N. Robinson, resided there since 1902, with the exception of a short time when tenants lived upon the property. A dwelling house also stands upon the appellants' lot and in it the appellants make their home. The description in their deed includes the disputed strip, and they are entitled to it unless the respondents gained title by adverse possession. The properties of the appellants and of the respondents are separated by the aforementioned fence which runs along the north line of the contested strip—if that fence is, in fact, the dividing line. If it is, the disputed strip belongs to the respondents.

The respondent, Henry N. Robinson, to whom we shall refer as Mr. Robinson, was 78 years of age when he testified. He swore that he became familiar with the Robinson place in 1900. By the Robinson place, we mean the entire area within the U enclosure just described; that is, the 50 by 100-foot lot, together with the disputed strip. The witness said that his father purchased the place in January, 1902, and that at that time the dwelling house in which the witness and his wife now reside had already been built. According to him, his father or some member of the latter's family lived upon the place continuously since 1902, with the exception of a short time when tenants occupied it. Mr. Robinson testified that he and his wife moved upon the property in December, 1926, and have occupied it ever since.

We mentioned the fact that a fence stands on the north line of the disputed strip. According to Mr. Robinson, a fence, which was built by one E. B. Hammond, stood, as early as February, 1900, at the identical place where the present one stands. It was made of wire and ran from the street to the alley. Referring to the time when he and his wife moved upon the property, December, 1926, Mr. Robinson testified:

"There was an old wire fence there, pretty well dilapidated. Some of the posts had rotted off and some hadn't, and it was in very bad shape. There was briers growing there in the northwest corner; * * *"

We quote further from his testimony:

"A. Along in the spring after I moved there in December, I went out and grubbed out the briers and bushes along there and tore the whole fence out and built the new fence, the one that is there now.

"Q. Where did you build it relative to the old fence?

"A. Just as near as I could get it to the old one.

"Q. You would say it was built on the same line exactly as the old one?

"A. The posts is set exactly where the old posts was set."

He swore that after he built the new fence in 1927 it was not thereafter "moved one iota" and that it stood at the time he testified upon the same line where he built it in 1927. The one he built was a picket fence. Photographs of the respondents' house are before us as exhibits. They show a part of the fence, which appears to be substantial and well maintained.

Mr. and Mrs. William S. Dunaven, who occupied the appellants' house for a five-year period beginning with 1926, declared that the old wire fence described by Mr. Robinson was still standing when they moved upon the appellants' property. According to Mr. Dunaven,

"There was a kind of wire fence; it was overgrown with blackberry bushes and wasn't much of a fence any more."

Referring to Mr. Robinson, the witness said:

"Soon after he moved on the premises he tore out the old fence and cleaned up the place and replaced this with a new fence between the two pieces of property."

He was sure that Mr. Robinson built the new fence on the exact line of the old one. Both he and his wife described the manner in which Mr. Robinson rid the rear part of the Robinson place of its rank growth and then cultivated the ground. They also described the two chicken houses, and testified that Mr. Robin-

son built them almost on the line of the fence. According to the Dunavens, everyone assumed that the fence marked the true dividing line and no thought to the contrary entered anyone's mind. They swore that the respondents maintained undisputed possession of all south of the fence.

M. D. Lewis, a real estate agent who has lived in Corvallis since 1919, testified that he inspected the respondents' property in 1926 preparatory to accepting it as security for a mortgage loan. He swore that there stood along the north side of the property "a web wire fence at the time; it was an old fence running through from the north side to the alley." When he returned to the property some months later, he observed that Mr. Robinson had replaced the old fence with one made of pickets. At other times when he was upon the property he noticed that Mr. Robinson was growing tomato plants which he had "stacked up against the fence."

No witness explained why the old wire fence which Mr. Robinson saw in 1902 was built along the line where it stood. Possibly no living person was familiar with the reason. If its construction was preceded by a survey, no one mentioned the fact. It is evident from Mr. Robinson's testimony that he thought the old wire fence stood upon the dividing line. He testified:

"A. I never had it surveyed. I just put it where the old fence was.

"Q. One of the reasons you occupied up to that line was that your folks did before you?

"A. Well, their predecessors had too for over 55 years.

"Q. And all of you considered that to be the true line?

"A. Yes, sir."

As we observed, Mr. Robinson testified that in the spring of 1927 he replaced the old wire fence with one he made of pickets. In addition to building the new fence, he made several other improvements. Each of these improvements not only indicated a belief upon his part that the disputed area belonged to him, but each also constituted a trespass by him if the area belonged to someone else. Some of the area near the fence was low, and Mr. Robinson, after building the new fence, brought the ground up to grade. Prior to his occupancy of the property, the rear of the lot was overrun with rank growth. He grubbed out the briars and other brambles. He and his wife planted shrubs, flowers and rosebushes adjacent to the fence and in some of the area beyond the fence put in a lawn. In 1927 Mr. Robinson and his son built a chicken house in the northwest corner of the Robinson place. It came within a foot of the fence. In 1936 Mr. Robinson tore down the chicken house and built a new one which came within three inches of the fence. In other words, both chicken houses were constructed in part upon the disputed strip. The exact size of the structures is not indicated, but the second one at least was of sufficient importance that its construction was preceded by the issuance of a building permit. Incidental to the construction of the chicken houses, Mr. Robinson added to the height of the fence which was near them. Between the street line of the property and the paved portion of the street was an area to which the witnesses referred as parking. Mr. Robinson improved the parking in front of his lot and the adjacent disputed strip. He, in effect, extended the fence across the parking by planting along that line a hedge of spiraea. He cultivated the area on his side of the hedge.

In 1923 the lot upon which the appellants reside was owned by a Mrs. Johnson. In that year she had a public sidewalk built in front of her property by a contractor whose name was Sandor. The walk terminated at the line where the fence would be if it were extended into the parking area. In other words, the sidewalk did not extend in front of the disputed strip. A year later, Mr. Robinson's mother, who then occupied the Robinson place, had a sidewalk constructed in front of the property. It began at the place where the walk built by Sandor ended, and extended in front of the disputed strip. The witnesses declared that the place where the walk ended and the other began could still be seen clearly at the time of the trial. The point was manifested by a mark or seam. The fence and the mark were upon the same identical line. Thus, we see that the appellants' sidewalk did not go the distance of the disputed strip, but the respondents' went all the way.

In December, 1927, Mr. Robinson applied to the aforementioned M. D. Lewis for a loan which he wished to secure with a mortgage upon the Robinson place. He showed Mr. Lewis the north fence and told him that it stood upon the north line of his property. Mr. Lewis looked at the aforementioned mark in the public side-walk and observed that it corresponded with the line of the fence. Mr. Lewis was an agent in the mortgage transaction, and his principal appears to have been one by the name of Thatcher. Lewis testified that he took Thatcher to the property, and "I told him the line is this fence." Later, in 1934, preparatory to securing a mortgage loan from the Home Owners Loan Corporation, Mr. Robinson represented to the agent of that concern that everything within the U enclosure

was a part of his property. He testified that he represented to Mr. Lewis and also to the Home Owners Loan Corporation that "fence to fence" was his property. It seems that the mortgages used the same description as the deeds which conveyed title to the respondents. However, Mr. Robinson's declarations to the mortgage loan agents indicate that upon the two occasions of which those incidents were a part he claimed title to the disputed strip.

The record warrants a belief that no one questioned the respondents' right to the disputed strip until a survey was made a year and a half prior to the institution of this suit. In fact, before the survey the respondents' right to the possession of the strip was not even the subject of conjecture. All took it for granted that the fence stood upon the true line and, accordingly, no doubts were bruited about. Since the matter was free from misgiving, there was no occasion for the assertion of claims of title except in the instances to which reference has already been made; that is, the construction of the fence, the building of a chicken house, the cultivation of the ground and the showing of the fence line when the mortgage loans were procured. Mr. Robinson testified:

"Q. I believe you testified up until that survey was made nobody, including the Leverenzs, had ever questioned your ownership or your right of possession of the property up to that fence?

"A. Yes, we always claimed it. My father claimed it up to the fence, and I claimed it up to the fence.

\* \* \*

"Q. Now, that little strip that you just described, you and your predecessors in interest, which consisted of members of the Robinson family, have been

in undisputed possession of that strip at all times since 1902?

"A. Yes, sir.

\* \* \*

"Q. And you have been working on it, put your building on a portion of it, cultivated shrubberies and flowers upon it, filled it in and treated it in all respects as your own during all those years?

"A. Yes, always knowing it as mine.

\* \* \*

"Q. One of the reasons you occupied up to that line was that your folks did before you?

"A. Well, their predecessors had too for over 55 years.

"Q. And all of you considered that to be the true line?

"A. Yes, sir."

Mr. Robinson's son Clifford, who is one of the respondents, and to whom title was conveyed in 1934, referring to his grandmother, testified:

"She considered it, and we all considered it, up to an old fence that was there between that yard and the neighboring yard."

With reference to his father's attitude, he said:

"He has always claimed it. We have never known any difference. We always assumed our property line ran up to the fence."

After he gave that testimony, he was asked concerning his own claims. We now quote from his testimony:

"Q. And have you claimed it?

"A. Yes, sir.

"Q. Since you became the owner by deed, where have you claimed to?

"A. Up to the fence."

Evidently, neither the respondents nor the appellants ever perused the descriptions in their title instru-

ments. If they measured the width of their lots, they made no mention of that fact when testifying. The respondents' fences enclosed more than 50 feet of frontage. The appellants possessed 50 feet of frontage, so they testified, but their north line, unbeknown to them, overlapped the property of their neighbor to the north. His name appears to have been Hinton. About a year and a half prior to the institution of this suit Hinton had his property surveyed and in that way discovered that the appellants' true north line was many inches south of where all had assumed it was. Then the appellants, as plaintiffs, instituted a suit against the respondents, as defendants, pursuant to §§ 9-1101 to and including 9-1105, O. C. L. A., to have determined the location of the boundary line between their properties. After the court had entered a decree in that suit and had appointed commissioners, the suit now before us was instituted. Later the commissioners determined the line and their report was confirmed by the court. Nothing done in that case is depended upon as res adjudicata in this suit, but the parties accept the line surveyed by the engineer in that case as the true line which divides the properties called for by the deeds possessed by the appellants and the respondents.

In the manner just indicated, the appellants and the respondents found that there was a controversy on their hands. It developed that, although they had lived alongside each other for many years in neighborly accord, there now lay a battleground in the little area between their homes. Even after Mr. Robinson was apprised of the results of the survey, he insisted that he owned the area south of the fence and that the latter marked the north line of his property. For a while he entertained a suggestion that he move the fence, but, as a witness, explained: ''That was before

I knew my legal rights." Later, he refused to move the fence and "when they told me they was going to start suit agin me, I told them to go ahead." It is apparent that even after the survey was made the respondents insisted that everything south of the fence was their property. They depended upon adverse possession. One day, when Mrs. Leverenz was attempting to remove some shrubs south of the fence, a lively altercation took place. Before the Donnybrook was over Mrs. Leverenz had been so injured that necessary medical attention cost her twelve dollars. Evidently the physical damage was not the only result of the hostilities, for Mrs. Leverenz was arrested on a charge of trespass.

The appellants presented no proof contradictory of that which shows that the respondents assumed possession of the ground up to the south side of the fence. Their testimony indicates that until the survey just described was made, they never claimed anything on the respondents' side of the enclosure; to the contrary, it shows that they acquiesced in the respondents' possession of all the premises we have termed the Robinson place. The testimony they gave confirms that presented by the respondents to the effect that the chicken houses were built in part upon the disputed strip. The appellants left unchallenged the evidence which shows that in 1900 and for some years thereafter an old fence stood upon the line where Mr. Robinson later built his fence. They likewise made no attack upon the proof which shows that the public sidewalk in front of their home does not parallel the width of the disputed strip.

The appellants purchased their property in the latter part of 1922, but it has been in possession of tenants for most of the time since that year. As we

have seen, it was in the occupancy of tenants in 1927 when Mr. Robinson, according to his testimony, destroyed the old wire fence and erected the new one. During at least a part of the time when tenants were in possession of their property, the appellants lived in Newport and visited their property infrequently. However, they resumed occupancy April 2, 1945. We mention these facts for the purpose of indicating that their opportunities for observing conditions were not the equivalent of those of the respondents.

Mrs. Leverenz, one of the appellants, testified that Mr. Robinson built the rear 40 feet of his fence in 1941. She voiced a belief that at that time he changed the location of the fence in such a way that he took more of her property. We quote from her testimony:

"Q. Is the fence that is there now in the same position as the fence that was there before the construction in 1941?

"A. It can't be because it was only supposed to be two feet, and now in what is supposed to be 50 feet there is another foot—there is three feet of our ground, and we measured it.

"Q. Has it been moved from the original position over farther on your property?

"A. Well, he moved it, I suppose when he built that fence, because it isn't straight by any means, any place."

Going on, Mrs. Leverenz testified that Mr. Robinson repaired and moved the fence several times, and added:

"He has taken a little (of appellants' property) every time he fixes the fence."

She also testified:

"The fence is not straight * * * and of course the sidewalk is away in on our property."

By the term "the sidewalk" we think she meant a cement walk that led from the front porch to the rear

of the Robinson property. If her statement was correct, then this walk was built in the disputed strip. She also swore that after the survey Mr. Robinson told her: "I knew I had your ground; I knew it all the time." In the summer of 1945, according to her, Mr. Robinson promised: "I will move the fence just as soon as it rains." She swore that after the rainy season had come Mr. Robinson repeated the promise several times.

Mr. Leverenz testified that in 1934 Mr. Robinson spoke of rebuilding the fence and that he (Leverenz) then offered to pay one-half of the expense "just so it is put up on the real property where it belongs." He swore that after the survey was made the following occurred:

"Mr. Robinson spoke up and said, "I knew that you was getting two feet of me; I knew that before," he says, and after that he says: 'I am going to move the fence,' and he said that about three or four times, always putting it off for a little further time and a little further."

He was positive that Mr. Robinson moved the fence further upon the appellants' property, after rebuilding it at a time which the witness did not mention. He explained:

"To the old fence there was 3½ feet, and now it is less than 2 feet. My building stands kind of cat a corner like this, and this corner is closer, and that corner is wider so they could drive in from the alley."

We quote again from his testimony:

"Q. Mr. Leverenz, when did you first know that Mr. Robinson was claiming a part of your property?

"A. I didn't know it until I had the survey really.

"Q. And when was that?
"A. That was in 1945."

The rules governing the acquisition of ownership through the medium of adverse possession are well established and known. The parties present no issues concerning the provisions of those rules. The controversy between them does not concern the rules, but the facts of this case. The appellants' brief states:

"The location of the fence was presumed to be on the true boundary line. The fence was permitted to become overgrown with briers and shrubbery until the exact line of the fence was obscured. The fence was reconstructed in about 1941 by defendant Henry N. Robinson. There is a dispute whether the fence as replaced is in the same location as originally built. The evidence is also conclusive that plaintiffs' assertion of title to the fence was founded on the mistaken belief that the fence was located on the true line; the plaintiffs never claimed, or intended to claim, any of defendants' property; the plaintiffs did not claim, or intend to claim, any land not included in the description contained in the deeds under which they held title."

We do not believe that after 1927 the fence was so "overgrown with briers and shrubbery until the exact line of the fence was obscured." Even prior to 1927 it was only the backyards of the two properties that were overgrown with briers and shrubbery. In that year Mr. Robinson grubbed out all the rank growth on his side of the fence and thereupon the latter was visible for its entire length of 100 feet. Nor can we concur in the statement that "the fence was reconstructed in about 1941 by defendant Henry N. Robinson", unless the appellants have reference to the fact that in 1941 Mr. Robinson changed some of the pickets and added to the height of the rear part of the fence.

We think that the evidence demands a conclusion that it was in 1927 that Mr. Robinson tore out the old wire fence and built the present one. We come now to the statement, "There is a dispute whether the fence, as replaced, is in the same location as originally built." It is true that Mrs. Leverenz believes that in recent years Mr. Robinson shoved the fence more and more onto her property, but the record satisfies us that the fence that was built in 1927 stands today where it was then constructed. Further, we think that a fence stood upon the same line in 1900, and that the one which Mr. Robinson built runs in a straight line.

■ Fences are often constructed in ignorance of the true line that separates properties. A fence may be built by a property owner who is oblivious of his boundary line and for the purpose of keeping out stray cattle, of preventing his chickens from invading his neighbor's garden, or for some other purpose unconcerned with an intention of marking a boundary line. A property owner who does not know whether his fence stands upon his or his neighbor's land, may acknowledge that his possession is subordinate to any right that may belong to his neighbor. In instances of that kind, possession is permissive and not adverse. Permissive occupancy for the prescriptive period does not disseise any one. But, even though no one knows whether or not a fence stands upon the true line, it is possible for an adjoining occupant to disseise the true owner by occupancy which has all the requisites of adverse possession. To effect such a result, the one who is in possession must not only hold possession beyond the true line for the required period, but he must do so under a claim of right, and with no intention of falling back to the correct line when it is discovered. His actions must proclaim the shibboleth, "My land,

right or wrong, my land!'' See to the above effect, *Jenkins v. Jenkins,* 171 Or. 629, 138 P. 2d 904.

We quote from *King v. Brigham,* 19 Or. 560, 25 P. 150:

> ''The evidence shows that Mr. King held possession, if at all, under mistake or ignorance as to his true line, and with no intention to claim beyond the true line when discovered.''

The decision added:

> ''Such a possession is not adverse and cannot ripen into a title as against the real owner.''

Later, the facts in that case were before this court again in *King v. Brigham,* 23 Or. 262, 31 P. 601, 18 L. R. A. 361. In that decision, the court said:

> ''Assuming that the plaintiff did occupy the land in question, his evidence, taken as a whole, judged in the light of surrounding facts, indicates that his possession or intrusion upon the land was by mistake, and in consequence of the confusion or uncertainty as to the true line, was unsuspected by him or the defendants, because he believed it to be the true line, but without any intention on his part to claim the title to any other land than was embraced within the boundary of his claim. It is not the case of one occupying land not embraced in his title under a mistake as to the boundary, claiming it as his own for the requisite statutory period. All this becomes more apparent when his evidence is considered with reference to the other testimony and in the light of the surrounding facts. Nor is this all. The greatest diversity exists between the witnesses as to the location of the fence upon which adverse possession is predicated, no two of them fixing it with certainty in the same place. In fact, the evidence lacks that certainty and convincing proof necessary to establish adverse possession. Besides, we are of the opinion

that plaintiff has no sufficient possession to maintain this suit; so that in any view the decree must be affirmed and suit dismissed.''

We now quote from *Parker v. Wolf,* 69 Or. 446, 138 P. 463:

"It is laid down in Caufield v. Clark, 17 Or. 473 (21 Pac. 443, 11 Am. St. Rep. 845), that where a person, under a mistake as to the boundaries, enters and occupies land not embraced in his title, claiming it as his own for the requisite statutory period, he thereby becomes vested with the title thereto by possession, although his entry may have been founded upon a mistake. This has been the settled rule in this state and is followed in subsequent decisions. In Dunnigan v. Wood, 58 Or. 119 (112 Pac. 531), Mr. Justice Bean reviews the authorities and reaffirms the doctrine: See, also, Stout v. Michelbook, 58 Or. 372, (114 Pac. 929).''

■ In *Anderson v. Richards,* 100 Or. 641, 198 P. 570, the record showed that the plaintiff was the owner of Lot 6, the defendant the owner of Lot 7, and that a fence stood between the two properties. The complaint averred that the "plaintiff has been, and still is, in possession of said premises up to the line fence enclosing the same." In affirming a decision for the plaintiff, the opinion quoted from *Smith v. Badura,* 70 Or. 58, 139 P. 107, as follows:

"Fencing a lot, building thereon and occupying it exclusively, sufficiently indicates an intention to claim title, adverse to all the world.''

The quoted words were actually taken from a headnote. It also took the following from *Silverton v. Brown,* 63 Or. 418, 128 P. 45:

"The possession of land may be shown by the evidence of different modes of possession, such as inclosure, the erection of buildings, or other im-

provements, or in any way that clearly indicates an exclusive appropriation of the land by the person claiming to hold it.''

The court, in affirming the Circuit Court's decree for the plaintiff, reasoned:

"Anderson proved that he and his ancestors had been in open, visible, notorious and exclusive possession of the land within his enclosure, for a period of more than ten years; that the land is enclosed with a substantial fence; that an orchard had been planted thereon and had borne fruit for many years; that costly and permanent improvements had been constructed, and that plaintiff had in all things treated the premises within the enclosure as his own. This evidence made a prima facie case for the plaintiff and raised the presumption that his entry had been one of right, and his claim one of ownership * * *.''

In *Krueger v. Brooks,* 94 Or. 119, 184 P. 285, it is said:

"The fact that all the land south of the fence was cleared and the fact that all the land south of the fence, which could be cultivated, was in truth cultivated up to the fence plus the fact that the fence was maintained as the dividing line for so many years is the strongest kind of evidence that Charles Krueger as well as his successor, the plaintiff, claimed ownership in all the land south of the fence. In brief, the evidence shows that the plaintiff is the owner in fee simple of Tract D by force of a title acquired by adverse possession: Gist v. Doke, 42 Or. 225 (70 Pac. 704) ; Dunnigan v. Wood, 58 Or. 119, 125 (112 Pac. 531) ; Stout v. Michelbook, 58 Or. 372 (114 Pac. 929).''

From *Chostner v. Schrock,* (Mo.), 252 S. W. 381, we quote:

"Where possession is held to a supposed boundary line and the parties intend to claim only to the

true line, wherever it might be, or to hold subject to future ascertainment, then the possession is not adverse and the statute will not run. But as said in numerous cases, if one takes possession of land and holds it by mistake, with no intention of taking what does not belong to him, that would not destroy the adverse character of his possession if it was his intention to hold all that was possessed, believing it to be his. * * * Under these authorities, if the defendant and his grantors claimed up to the road, and did not qualify their claim by a willingness to abide by a correct line to be ascertained, then their possession was adverse. The evidence shows that they held up to the road, and to where the line was marked by blazes on the trees, because they thought the road and the blazes the true line. That was the reason for claiming that to be the line, but the instruction tells the jury if they claim up to that line for that reason the possession was not adverse, which is equivalent to saying if their holding was in good faith their possession was not adverse. The instructions were erroneous."

We think that the foregoing sufficiently state, for the purposes of this case, the principles of law which govern the acquisition of property by adverse possession.

■ Evidently, when the original fence was built in 1900 or in some year prior thereto, no one knew the exact location of the true line which separated the coterminous lots. But we are satisfied that, beginning not later than 1927, the respondents and their predecessors in interest claimed title to the fence, the land upon which it stood, and everything south of it. Their claim and conduct were manifest and unequivocal. Although Mr. Robinson, for a short time following the survey, was undecisive, at all other times the respondents never conceded even once that the fence possibly did

not stand upon the true line. They never gave any indication of a purpose to retreat to the true line if the fence was not upon it. Ever since the respondents assumed occupancy in December, 1926, their conduct was tantamount to the throwing down of a gauntlet and the announcement of a purpose to hold to the fence. We shall review the facts no further. They show that the respondents' possession was not permissive, but adverse. It was not necessary that the respondents held possession under a belief that they were the true owners of everything within their enclosure, although we are satisfied that they so thought. It was, however, essential that their occupancy was hostile to all others. We think that it was, and are convinced that their possession had all of the requisites of adverse possession.

It follows that, in our opinion, the first assignment of error is without merit.

In view of the fact that the appellants concede that they have no interest whatever in the part of the respondents' property which was conveyed to the respondents by deed, they lack a basis for the second assignment of error. We dismiss it as without merit.

Affirmed.