Argued and submitted July 9, reversed and remanded with instructions
September 23, 1998, petition for review allowed February 23, 1999 (328 Or 330)

Jerry HOFFMAN
and Amy Hoffman,
*Respondents,*

*v.*

FREEMAN LAND AND TIMBER, LLC.,
John R. Freeman Family Trust
and Credit Shelter Trust,
substituted for: Joan Freeman,
Personal Representative for Riley Freeman, Deceased,
John Doe Freeman, Jim Doe Freeman and
The Unknown Heirs,
*Appellants.*

(95-084; CA A97665)

964 P2d 1144

J. David Coughlin argued the cause for appellants. With him on the opening brief was Coughlin, Leuenberger & Moon, P.C.

Kent A. Anderson argued the cause and filed the brief for respondents.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

This action involves a dispute about ownership of a parcel of land. Plaintiff[1] sued to eject defendants from the land and to quiet title in himself. Defendants counterclaimed on the ground that they had acquired title under a theory of adverse possession. The trial court declared plaintiff to be the owner of the property and ejected defendants from the property. We review the claim *de novo*,[2] ORS 19.415(3), and reverse.

The disputed property consists of 4.7 acres designated as Lot 20 of the Deerview Park Subdivision. It is located approximately 20 miles west of Baker City. All lots in the subdivision, except Lot 20, lie west of a road commonly referred to as either Deer Creek Road or Alder Creek Road. Lot 20 lies immediately east of the road and within the fenced area of defendants' 5,000 acre Bar C Bar Ranch (the ranch).

Plaintiff is the record title holder of Lot 20. He purchased Lot 20 in 1983 from Cathy Frohlich, who had owned the land now comprising the Deerview Park Subdivision since 1969. Frohlich never lived on any of the property. During her ownership, she cleared timber to put in roads throughout the property west of Alder Creek Road as required for establishing the subdivision. In 1977 to 1979, William Hanley conducted a survey of the property on Frohlich's behalf; she used the survey to apply for approval of the subdivision. A public hearing was held in May 1979 concerning Frohlich's proposed subdivision. She received approval the following month. Frohlich placed "For Sale" signs on the property west of Alder Creek Road, but there is no evidence that any signs were ever placed on Lot 20.

---

[1] The parties stipulated at trial that Amy Hoffman should be removed as a plaintiff. She is the daughter of Jerry Hoffman and was on the title to the property when the action was filed. At the time of trial, the parties stipulated that Jerry Hoffman is the sole record title holder to the property.

[2] The parties agree that our standard of review is *de novo*. Although each party seeks the remedy of ejectment, a legal remedy, their claims are predicated on the success of their endeavors to quiet title in themselves. Because the issues raised on appeal all relate to the claims to quiet title, we treat the appeal, as have the parties, as an appeal from an equitable judgment and, therefore, *de novo* review is appropriate under ORS 19.415(3). *Nedry v. Morgan*, 284 Or 65, 67 n 1, 584 P2d 1381 (1978).

Dave Rasmussen purchased the ranch in 1954. Alder Creek Road and the fence enclosing Lot 20 within the ranch have been in place since at least the 1940s. Rasmussen, and later his personal representative and trustee, leased the ranch to defendants during 1974 to 1982 and from 1986 through 1987.[3] Defendants eventually purchased the ranch in 1987. Lot 20 makes up the extreme western part of an area on the ranch known as the Boy Scout Pasture. The pasture is approximately seven to eight hundred acres in size. No artificial or natural boundaries separate the boundaries of Lot 20 from the rest of the Boy Scout Pasture, and a creek runs through it. Defendants and their predecessors in interest have grazed cattle in the warmer months on the Boy Scout Pasture since 1954. Also, they trimmed and thinned the trees in the area regularly and maintained the fence along Alder Creek road that separated it from the pasture, although the fence was on occasion in poor condition.

No disputes arose over the use of Lot 20 by the ranch until 1994, when plaintiff listed Lot 20 for sale and defendants confronted plaintiff's realtor about the ownership of the property. This litigation followed. After the trial court heard the evidence, it was not persuaded that defendants' evidence satisfied the elements of adverse possession and held for plaintiff. On appeal, defendants make multiple assignments of error, including the trial court's admission into evidence of testimony from Frohlich about statements made by Rasmussen, now deceased, to her. Plaintiff raises a cross-assignment of error regarding the admission of testimony by a realtor also regarding statements made by Rasmussen. We will address the correctness of the evidentiary rulings in the context of our overall analysis of the evidence.

■ ■ In order to establish title by adverse possession, defendants must show clear and convincing proof of actual, open, notorious, exclusive, continuous and hostile possession of the property for a 10-year period.[4] *Rayburn v. Coffelt*, 153

---

[3] For the sake of simplicity, we use the term "defendants" when referring to not only the named defendants but also to Joan Freeman, John Freeman and Riley Freeman.

[4] The parties stipulated that the case was to be tried using the pre-1990 common law on adverse possession. Under defendants' theory, their interest vested

Or App 76, 80, 957 P2d 580 (1998). Defendants argue that for any and all 10-year periods between the 1940s and 1990s, they or their predecessors in interest met the requirements of adverse possession.[5] We focus our analysis on the period of 1970 through 1980, the first full 10-year period for which testimony was offered. During this time, Frohlich was the record title holder of Lot 20, and Rasmussen was the record title holder of the ranch.

The element of actual possession requires "occupation or use of the land that would be made by an owner of the same type of land, taking into account the uses for which the land is suitable." *Lee v. Hansen,* 282 Or 371, 376, 578 P2d 784 (1978). The land in this case consists of sparse grass and timber, suitable for the grazing of cattle. Bill McGinn worked for the ranch from 1970 through 1971. He testified that he saw cattle in the disputed area and that the ranch used all the area within the fenced boundary. Bill Freeman testified that, during 1972 through 1973, cattle were grazed in the Boy Scout Pasture. James Swearingen worked on the ranch from 1973 through 1975. He testified that the ranch used Lot 20 for cattle grazing and that he cleared brush and debris from tree thinning operations on Lot 20. Clair Pickard worked on the ranch from 1975 through 1976. He testified that during that time, cattle were grazed in the Boy Scout Pasture and that he thinned trees and piled brush on the lot. James Martin worked for the ranch from 1977 through 1984. He testified that during Rasmussen's ownership, there was active trimming and stacking of brush on Lot 20. His testimony about the cattle grazing is particularly detailed:

"Q.  Tell me about the cattle's use of that meadow. How often would they be there, and what was the general use made by the cattle in that area?

"A.  Generally we put cattle in there, of course, depending on the spring, anywhere from the middle of April. Sometimes we wouldn't get them in until maybe the 1st of May. There was no specific date, but generally by the 1st of May

---

before the enactment of ORS 105.620, and, the statute is therefore inapplicable. *Davis v. Parke,* 135 Or App 283, 286 n 1, 898 P2d 804 (1995).

[5] Defendants are entitled to claim rights to property obtained by adverse possession during the ownership of their predecessors. *Evans v. Hogue,* 296 Or 745, 756, 681 P2d 1133 (1984).

we had it pretty well stocked. Riley was very careful that we didn't overstock it too early and keep the grass from coming up. The cattle would feed in here in the early morning.

"Q.  'Here' meaning, again?

"A.  In the pasture, in the meadows. And then they would go right over into the timber to bed. And we kept the salt in the timber. We kept it—Normally we wouldn't put it out in the meadow. Then they utilize this side over here with the grass, and this is the swale."

In addition, John Freeman worked on the ranch during several summers, beginning in 1974. He testified:

"Q.  How did Bar-C-Bar use Lot 20? What utilization did the Bar-C-Bar make of Lot 20?

"A.  It was for cattle grazing.

"* * * * *

"Q.  How often would the cattle cross this particular piece of property on a regular basis?

"A.  Um . . . ever—every couple weeks.

"Q.  Did they—what use did they make—or you make of this particular area?

"A.  This particular area, Lot 20 lays down off a bench from the—pasture proper, the meadow that is in the Boy Scout pasture is up on a bench maybe fifty feet above where Lot 20 is. Any time you gather this pasture you have to ride down off the bench because you can't see it from on top, so every time we gather this pasture somebody had to ride the perimeter of the field right through the middle of Lot 20, so every—every time we gathered that field which would have been every two or three weeks somebody would have ridden through there."

■    Plaintiff offered no evidence that contradicted the above uses of the property as described by those witnesses. Also, Frohlich testified that she made no use of the land west of Alder Creek Road. Based on the evidence, we conclude that the limited grazing, the bedding down of cattle, the tree thinning and the brush removal are uses an ordinary owner would make of land like Lot 20. *See Davis*, 135 Or App at 287 (holding that "[t]he fact that plaintiffs' cattle did not spend a

lot of time grazing on the disputed property does not defeat their claim for adverse possession"). As a result, we conclude that defendants provided clear and convincing evidence that Rasmussen was in actual possession of Lot 20 from 1970 to 1980.

■        To satisfy the open and notorious requirement, defendants must either show that Frohlich had either actual or constructive notice of their claim of ownership of Lot 20. *Corson v. Williford*, 44 Or App 145, 149, 605 P2d 1194 (1980). Defendants presented no evidence that Frolich had actual notice that Rasmussen claimed ownership of Lot 20. We stated in *Rayburn* that "the continuous existence of the fence alone is insufficient to put [owners] on notice of an adverse possession claim." 153 Or App at 81 (citations omitted). The probative character of a fence is but one factor to be considered. While *construction* of a fence by adverse possession claimants is recognized as providing constructive notice, *Slak v. Porter*, 128 Or App 274, 279, 875 P2d 515 (1994), the fence bordering Alder Creek Road and Lot 20 was in existence since the 1940s, and it is unclear from the record who erected the fence. Therefore, the question is whether the fence along with the evidence of defendants' other activities provides clear and convincing proof that defendants gave constructive notice of their claim to Lot 20.

■        The trial court concluded that the fence was not a boundary fence but rather followed the road for the sake of convenience. Nonetheless, the structure of a fence can indicate its purpose. The greater weight of the testimony is that the ranch regularly maintained the fence to enclose the pastures east of Alder Creek Road to contain the cattle that it grazed there. McGinn testified that in 1970, he rebuilt the portion of the fence bordering Alder Creek Road and Lot 20:

"Q.    Tell us what the condition of the fence was before you built it?

"A.    Near as I can remember there was a three wire, possibly four but only a three wire fence there which was put up with wood posts as near as I can remember. After going back up and refreshing my memory I remember burning a lot of wood posts along that road there, tearing out the old wire that was there.

"Q. And what did you replace it with?

"A. Steel posts and steel wire.

"Q. How many strands?

"A. Four."

McGinn's testimony is supported by the testimony of numerous other witnesses including plaintiff who testified that "[i]t seemed like a good fence" in 1983, when he bought Lot 20. We conclude that from 1970 through 1980, the fence's characteristics indicated that it was a permanent fence and regularly maintained in order to enclose the grazing land to the east of Alder Creek Road.

In addition to the nature of the fence, "no trespassing" signs existed along the east side of Alder Creek Road that could have alerted Frohlich that Rasmussen claimed Lot 20 as part of the ranch. On our *de novo* review of the evidence, we disagree with the trial court's finding that there was no evidence of "no trespassing" signs on the fence next to the road abutting Lot 20. The trial court relied heavily on Hanley's testimony, his survey and the lack of survey notes indicating the presence of "no trespassing" signs. However, Hanley's notes did not indicate the existence of the fence, and he testified that his survey team would have spent less than a day surveying Lot 20. In contrast, Pickard and plaintiff both testified that "no trespassing" signs were posted along Alder Creek Road. Plaintiff indicated that that was how he knew that the ranch owned property to the east of the subdivision. Bill Freeman, Joan Freeman and Martin also testified that, to the best of their recollection, "no trespassing" signs were posted on Lot 20. In our view of the evidence, defendants provide persuasive evidence that "no trespassing" signs were posted along or on Lot 20 during the relevant 10-year period. The "no trespassing" postings, the permanent fence, the presence or signs of cattle, the signs of timber thinning and the presence of ranch hands on Lot 20 all provided constructive notice to Frohlich of Rasmussen's occupation of the disputed area.[6] We hold that Rasmussen's use of Lot 20 was open, notorious and exclusive from 1970 to 1980.

---

[6] The testimony in this case is in stark contrast to that in *Miller v. Bushnell*, 275 Or 45, 48-49, 549 P2d 655 (1976), where the *uncontradicted* testimony of witnesses "was that there were no signs that stock had grazed on [the disputed property]."

Finally, defendants must show that Rasmussen's possession of Lot 20 was hostile to Frohlich's ownership. As we recently stated:

"If it is demonstrated that the disputed property was used openly and continuously for the requisite ten year period, hostility is presumed. To rebut the presumption, there must be evidence either that the use was permissive or that the use did not interfere with the other parties' use of the property." *Meier v. Rieger*, 152 Or App 312, 318, 954 P2d 786, *rev den* 327 Or 431 (1998) (citations omitted).

Since the ranch exclusively used Lot 20, the only remaining issue is whether there is persuasive evidence that the use was permissive.

■ Frohlich testified that she did not really know where the boundaries between her property and Rasmussen's were until the subdivision survey was completed. The survey was completed in 1979. Therefore, if she gave permission to Rasmussen to use Lot 20, it would necessarily have to have occurred between 1979 and 1980 in order to defeat defendants' adverse possession claim. Frohlich testified that she had conversations with Rasmussen regarding the boundaries after the subdivision was approved in July 1979 and a year to six months before Rasmussen's death. Over defendants' objection, Frohlich testified that in those conversations, Rasmussen (1) did not claim ownership of Lot 20; (2) that he acknowledged her ownership of Lot 20; and (3) that he offered to purchase Lot 20 or trade other property that he owned for it.

Defendants assign error to the trial court's ruling that Rasmussen's statements are admissible under OEC 804(3)(c). OEC 804(3)(c) provides, in part, an exception to the hearsay rule:

"A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true."

Under the rule, plaintiff is required to provide, "some evidence, or at least an inference which could be drawn from that evidence, which indicates that the declarant realized that the statements were against his pecuniary interest at the time they were made." *Reynoldson v. Jackson*, 275 Or 641, 645, 552 P2d 236 (1976). According to Frohlich, the statements were made at a time when ownership of Lot 20 was in dispute. We agree with the trial court that plaintiff provided sufficient evidence from which an inference can be drawn that Rasmussen realized that his statements were against his pecuniary interests. Therefore, the testimony was properly admitted.

■    The issue then remains whether the statements defeat the claim that Rasmussen adversely possessed Lot 20. Frohlich testified that she and Rasmussen agreed to exchange property to remedy the situation but, because Rasmussen left town on short notice, no steps were taken to complete the exchange. According to Frohlich, the ranch continued to keep Lot 20 fenced within its boundaries, and she made no use of it herself. At no point in her testimony did Frohlich testify that she gave permission to Rasmussen to continue to use the property or that she took action to prevent the continued use of the property by the ranch.

A similar situation existed in *Robinson v. Leverenz*, 185 Or 262, 282-83, 202 P2d 517 (1949), where the claimants' hostile *conduct* before a survey was "manifest and unequivocal." The adverse claimants in *Robinson* had bought a house and lot and had lived there for over 20 years. At the time they moved in, a backyard fence separated their lot from their neighbors' property. The court found that, although the claimants had rebuilt the fence, it was in substantially the same position as at the time of purchase. As in this case, a survey done years later disclosed that the neighbors were the record title holders of the land within the area that claimants had fenced.

At trial, the record title holders in *Robinson* testified that, after the survey's completion, claimants conceded that they knew that the fence was not on the line and said that they would move the fence. However, they never moved the

fence and continued to use the disputed area. The court reasoned that, even if the testimony was credible, it did not defeat the adverse possession claim:

> "[W]e are satisfied that beginning not later than 1927, the respondents and their predecessors in interest claimed title to the fence, the land upon which it stood, and everything south of it. Their claim and conduct were manifest and unequivocal. Although [claimant], for a short time following the survey, was undecisive, at all other times the [claimants] never conceded even once that the fence possibly did not stand upon the true line. They never gave any indication of a purpose to retreat to the true line if the fence was not upon it. Ever since the [claimants] assumed occupancy in December, 1926, their conduct was tantamount to the throwing down of a gauntlet and the announcement of a purpose to hold to the fence. We shall review the facts no further. They show that the [claimant's] possession was not permissive, but adverse." 185 Or at 282-83.

Here, the ranch used Lot 20 openly and notoriously for many years, just as the claimants in *Robinson* used the disputed land enclosed by the fence. In both cases, when a survey ultimately indicated that the fence did not coincide with the title descriptions, there was discussion about doing something to correct the error, but no action was taken. Frohlich does not claim that at that point she gave Rasmussen permission to use Lot 20, nor did the record owner in *Robinson* give permission to the adverse claimant to use the property. Most importantly, Rasmussen and the claimant in *Robinson* continued to use the property after their conversation as they had before. It is that continued use that fulfills the element of hostility.[7] It follows that defendants have met their burden of proving all the elements required for acquiring Lot 20 by adverse possession.

---

[7] *Compare Robinson with White v. Chandler*, 52 Or App 951, 955, 630 P2d 372 (1981) (holding the claimant's failure to communicate his adverse claim when permission was given was inconsistent with hostile possession). *See also House v. Hager*, 130 Or App 646, 651, 883 P2d 261 (1994) (reiterating the principle that an uncommunicated acquiescence is insufficient to rebut the presumption of hostility).

■      We do not reach plaintiff's other arguments on this issue because they do not affect our determination. Rasmussen's use continued to be hostile. We also do not reach plaintiff's cross-assignment of error because defendants met their burden of proof without reliance on the evidence admitted by the trial court over plaintiff's objection.

We remand for the trial court to enter judgment in favor of defendants on their counterclaim.

Reversed and remanded with instructions to quiet title in defendants.