Argued and submitted November 5, 1997; reassigned April 3, decision of Court of Appeals affirmed; judgment of circuit court reversed, case remanded to circuit court with instructions July 24, 1998

Jay FAULCONER
and Sheila Faulconer,
husband and wife,
*Respondents on Review,*

*v.*

Billie J. WILLIAMS,
*Defendant-Respondent,*

*and*

John C. MACKEY
and Jeanne L. Mackey,
*Petitioners on Review,*

*and*

Robert D. WEBB
and Carolyn L. Webb;
Randy L. Bahler and Donna J. Bahler;
Kenneth J. Stevenson and Joanne Stevenson;
Jerry L. Lasater and Dawn Lasater;
Elmer C. Williams and Marie E. Williams,
*Defendants-Respondents,*

*and*

Michael A. REVELLE
and Sandra A. Revelle,
*Petitioners on Review.*

(CC 95-10169; CA A93542; SC S44308)

964 P2d 246

Hilary E. Berkman, Corvallis, argued the cause and filed the brief for petitioners on review.

George B. Heilig, of Cable, Huston, Benedict & Haagensen, LLP, Corvallis, argued the cause and filed the brief for respondents on review.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Kulongoski, Justices.**

GILLETTE, J.

---

** Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision.

## GILLETTE, J.

The issue in this real property dispute is whether an express easement over plaintiffs' property was extinguished through adverse possession, although deeds to the property given after the claimed period of adverse possession continued to refer to the easement. The trial court held that the easement continues to exist. The Court of Appeals reversed, holding that the easement was extinguished by adverse possession during the period of ownership of one of plaintiffs' predecessors in interest and that reference to the extinguished easement in later deeds did not operate to re-create the easement. *Faulconer v. Williams*, 147 Or App 389, 936 P2d 999 (1997). We allowed review and now affirm the decision of the Court of Appeals.

The Court of Appeals reviewed the judgment of the trial court *de novo*, ORS 19.415(3).[1] We accept the facts as found by the Court of Appeals and limit our review to questions of law. ORS 19.415(4). The following facts are taken from the Court of Appeals' decision and from other undisputed facts in the record.

The land in dispute is located in rural Benton County.[2] In the 1950s, that land and much of the surrounding area was owned by Lewis and Nellie Passon. The Passons lived in a house on what is known as Tax Lot 300 (the servient estate). Tax Lot 300, now owned by plaintiffs, is located on the east side of Mountain View Drive, a north-south county road. The Passons began to sell off parcels of their holdings and, in 1957, they sold Tax Lot 100 (the dominant estate), which is located immediately to the east of Tax Lot 300, to Elmer and Billie Jean Williams. As part of that transaction, the Passons conveyed to the Williams an express, 20-foot-wide, east-west easement over Tax Lot 300 for a right of way to allow the Williams access to Mountain View Drive.

---

[1] The Court of Appeals stated that its review was *de novo* under ORS 19.125(3). *Faulconer*, 147 Or App 389, 391, 936 P2d 999 (1997). In 1997, ORS 19.125 was renumbered as ORS 19.415.

[2] To assist the reader, a map—not to scale—is included on the facing page as "fig. A." The disputed strip is marked with cross hatching. The present road—described *post*—lies immediately to the north of it.

N

True northern boundary of Tax Lot 300

True northern boundary of Tax Lot 100

Existing Road

MOUNTAIN VIEW DRIVE

Disputed Strip

TAX LOT 300 (Passon)

TAX LOT 100 (Williams)

fig. A

The easement was described in metes and bounds in the Williams' deed and lies over the north 20 feet of Tax Lot 300. Tax Lot 100 in turn was subject to a similar easement for the benefit of other property then owned by the Passons.

At the time of the conveyance, there was no physical access to Mountain View Drive from Tax Lot 100, and a road had to be built. A wire fence, remnants of which still stand today, ran east-west between Mountain View Drive and Tax Lot 100. That fence, which was north of the Passons' house, ran along the northern boundary of the Williams' property. Lewis Passon directed that a private road be constructed immediately south of the fence, and he and Elmer Williams together cleared trees and brush and built the road.

The road that Passon and Williams built lies over the north 20 feet of the *Williams'* property (Tax Lot 100), but, in fact, does not cross Tax Lot 300 at all. Instead, the road lies north of Tax Lot 300 and crosses property never owned by the Passons.[3] That is, the northern boundary of Tax Lot 300 does not, as both the Passons and the Williams believed, extend directly west from the corner of Tax Lot 100. The northern boundary to Tax Lot 300 is parallel to, but to the south of, the northern boundary of Tax Lot 100, and the true southern boundary of a 20-foot easement strip that runs along the northern side of Tax Lot 300 lies within seven feet of the Passons' (now plaintiffs') house. Despite the metes and bounds description in the deeds, neither the Passons nor the Williams actually were aware of the discrepancy in the northern property lines of Tax Lots 100 and 300.

After the private road was constructed, Lewis Passon built a retaining wall and fence just to the south of the roadway, along the actual northern boundary of his property. He planted trees and shrubs in the fenced area and maintained it as part of his yard.

In 1959, the Passons sold Tax Lot 300 to the Williams. The deed conveying that property did not include reference to the easement, but the Williams clearly knew of

---

[3] Because the land to the north of Tax Lot 300 never was owned by the Passons, the remedy of reformation of the deeds to conform them to the understanding of the original parties was not available to plaintiffs.

its existence, because they owned one of the properties that benefited from the easement and Elmer Williams had helped to build the roadway. The Williams conveyed Tax Lot 300 to the Fryers in 1964. The Fryers sold that lot to the Hendricksons in 1982, and the Hendricksons sold it to plaintiffs in 1989. All those conveyances provided that they were "subject to" or were conveyed "except for" an easement described by reference to the 1957 deed conveying Tax Lot 100 from the Passons to the Williams.

Notwithstanding the reference to the easement in their deeds, all the subsequent owners of Tax Lot 300 believed that the wire fence to the north of the private road lay along their true northern property line. All treated the disputed strip as their own. The Fryers extended the fence that Lewis Passon had built so that it joined another fence running north-south along the eastern boundary of the property, making east-west travel through the actual easement impossible. Within the easement strip, they also planted a grape arbor and fir trees that have grown quite large. The Hendricksons used the property in the same way and plaintiffs, too, believed that the easement ran along the existing roadway. Plaintiffs maintained the wall and fence between the private road and their yard.

Defendants are all successors in interest of other Passon grantees and are the owners of the dominant estates in whose favor the 1959 easement was created. Most of the defendants believed, as did plaintiffs, that the existing private road lay within the easement.

After a 1995 survey disclosed the mistake as to the location of the easement, plaintiffs sued to quiet title. They asserted that they or their predecessors had acquired title to the disputed 20-foot strip through either adverse possession or abandonment. The trial court disagreed. With respect to the abandonment question, the court ruled that plaintiffs had not demonstrated that defendants ever took any action indicating their intent to abandon their right to use the easement over plaintiffs' property. Turning to the adverse possession claim, the trial court held that, although plaintiffs, along with their predecessors in interest, used the property for the requisite 10-year period and that use was open, exclusive,

and continuous, they had not shown that the use was "hostile," inasmuch as they had not shown that the use was adverse to defendants' interest in the easement. Finally, the court concluded that, even if the Fryers' activities extinguished the easement by adverse possession, they and, in turn, the Hendricksons, had re-created the easement when they transferred Tax Lot 300 "subject to" or "except for" the easement.

Plaintiffs appealed, assigning error to each of the trial court's rulings. As noted, the Court of Appeals reversed on the grounds that the easement was extinguished by adverse possession during the 18-year period of the Fryers' ownership and that the reference to the extinguished easement in subsequent deeds was insufficient to re-create the easement in favor of defendants. For the reasons that follow, we agree.

■ ■ An express easement may be extinguished by adverse possession. *Simpson v. Fowles*, 272 Or 342, 344, 536 P2d 499 (1975). For that to occur, all the elements of adverse possession must be shown by clear and convincing evidence. *See Thompson v. Scott*, 270 Or 542, 546-47, 528 P2d 509 (1974) (clear and convincing evidence of all elements is necessary for acquisition of easement by adverse possession).[4] That means that plaintiffs must establish by clear and convincing evidence that their use of the land subject to the easement was actual, open, notorious, exclusive, continuous, and hostile for the full statutory period of 10 years.[5] *Scott v. Elliott*, 253 Or 168, 178, 451 P2d 474 (1969). Failure to meet even one of those elements will destroy a claim of adverse possession.

We begin with the element of hostility or adversity, because defendants' primary argument is that plaintiffs have failed to prove that element.

---

[1] ORS 105.620, adopted by the legislature in 1989, imposes a similar requirement. That statute also contains other requirements for the successful maintenance of a claim for adverse possession, but it applies only to claims for title in which the interest vested after 1989. Here, plaintiffs claim and the Court of Appeals held that plaintiffs' interest vested before 1989.

[5] ORS 12.050 establishes a 10-year statutory period to acquire land through adverse possession. It provides, in part:

"An action for the recovery of real property, or for the recovery of the possession thereof, shall be commenced within 10 years."

■■   In the context of adverse possession, the term "hostile" means that the claimant possessed the property intending to be its owner and not in subordination to the true owner. *Mascall v. Murray*, 76 Or 637, 643-44, 149 P 517 (1915); *see also Sertic v. Roberts*, 171 Or 121, 134, 136 P2d 248 (1943) ("Adverse possession depends upon the intent of the occupant to claim and hold real property in opposition to all the world."). Additionally, when the claim is for adverse possession of an *easement*, the claimant generally must show that his or her use of the property is inconsistent with the existence of the easement. *Horecny v. Raichl*, 280 Or 405, 408, 571 P2d 495 (1977); *see also Tucker v. Nuding*, 92 Or 319, 328-29, 108 P 903 (1919) (use adverse to the enjoyment of an easement for a period sufficient to create a prescriptive easement will destroy that easement).

■   The Court of Appeals found that this was a case in which a party possesses land under the mistaken belief of ownership. *Faulconer*, 147 Or App at 394-95. Under established Oregon case law, inquiry into plaintiffs' intent to possess as the true owner under that circumstance is unnecessary. *See, e.g., Lee v. Hanson*, 282 Or 371, 375, 578 P2d 784 (1978) (possession of realty under the mistaken belief of ownership satisfies the element of hostility without the need for further inquiry into the claimant's subjective intent, but the belief must result from pure mistake, rather than a mistake based upon conscious doubt). Because the use of the disputed strip by plaintiffs and their predecessors in interest resulted from a "pure mistake" as to the correct location of the easement, the Court of Appeals held that plaintiffs' and their predecessors' use of the easement cannot be said to have been permissive. *Faulconer,.*147 Or App at 395. Under those circumstances, the court held the actions of constructing and maintaining the fence and retaining wall in the easement area, together with the plantings, demonstrated that the use was "hostile." *Ibid.*

On review, defendants take issue on two separate grounds with the Court of Appeals' conclusion that plaintiffs had satisfied the hostility requirement. First, defendants argue that the Court of Appeals did not give due consideration to the difference between the adverse possession of land owned by another and the adverse possession of an easement. In particular, they assert that, because the servient

estate holder (in this case, plaintiffs) owns the fee in the land and has the right to use the land covered by the easement for normal residential purposes, he or she must demonstrate more extensive activity clearly inconsistent with the use of the easement in order to show hostility. Defendants also cite several cases from other jurisdictions holding that, in the case of an easement that never has been used, even fencing off the easement area is insufficient to demonstrate adversity until (1) the need for the right of way arises, (2) a demand is made by the owner of the dominant estate that the easement be opened, and (3) the owner of the servient estate refuses to do so. Defendants urge this court to adopt a similar rule in Oregon.

Second, defendants argue that the Court of Appeals' reliance on the doctrine of "pure mistake" is misplaced for two reasons. First, an easement owner actually owns fee title to the land and logically cannot operate under a "mistaken belief of ownership." Second, the Court of Appeals failed to take note of the fact that, in 1968, the Fryers, during whose ownership the court held that the easement was extinguished, had ordered a survey that determined the true location of the easement and, therefore, the Fryers cannot have possessed the easement area under any mistaken belief of ownership. We reject both of those arguments.

We address the applicability of the doctrine of "pure mistake" first, because it controls our analysis of both parts of defendants' argument. In *Norgard v. Busher*, 220 Or 297, 349 P2d 490 (1960), this court explained that pure mistake exists where a deed correctly identifies the boundaries of the land conveyed, but the person taking property under that deed actually occupies other property that he mistakenly believes is covered by the deed. The court stated that " 'the intent derived directly from the physical senses, i.e., the intent to claim the land actually occupied, should be regarded as overriding the less immediately effective intent to hold in conformity with the deed.' " *Id.* at 302, *quoting* Fuller, *Adverse Possession — Occupancy of Another's Land Under Mistake as to Location of a Boundary*, 7 Or L Rev 329, 336 (1928). The court distinguished the concept of "conscious doubt," the existence of which would require exploration of the possessor's

actual intent, as in a case "where it appears that the possessor was aware of the possibility that he might be intruding upon his neighbor's land." *Id.* at 302. The court then held that "possession under the mistaken belief of ownership *satisfies the element of hostility or adverseness in the application of the doctrine of adverse possession.*" *Id.* at 303 (emphasis added).

■■ We hold that the "pure mistake" doctrine is equally applicable in the easement context. As noted above, the element of hostility is met when the claimant intends to occupy the land as the owner and not in subordination to the true owner. In the easement context, hostility entails an intent to occupy land without subordination to the rights of the holder of the dominant estate. Thus, if an adverse claimant occupies land that is subject to an easement under the mistaken belief that the easement lies elsewhere, and intends to possess that land as the owner and not in subordination to the rights of others to use that land for roadway purposes, then the element of hostility is satisfied. No further inquiry into the claimant's state of mind is necessary.

■ We also reject defendants' argument that the Fryers could not have operated under a mistaken belief in their ownership of the 20-foot strip, because they had ordered a survey in 1968 that disclosed the true location of the easement. Implicit in defendants' argument is the proposition that, after 1968, the Fryers had constructive knowledge of the fact that the easement lay across what they considered to be their yard. However, the notion of "constructive knowledge" is inconsistent with the reasoning behind the doctrine of pure mistake and plays no role in our analysis. Anytime a deed describes the true location of a boundary, particularly by metes and bounds, the owner is on notice of that location. "Pure mistake," however, is based on the idea that the possessor "direct[s his] claim to an object identified by the senses as a thing claimed" notwithstanding that the deed describes other property. *Norgard*, 220 Or at 302, *quoting Bond v. O'Gara*, 177 Mass 139, 58 NE 275, 276 (1900).

In this case, although the Court of Appeals, on *de novo* review, did not make specific note of the existence of the 1968 survey, it concluded that the "Fryers occupied the easement openly, notoriously, exclusively and hostilely, for over

10 years." *Faulconer*, 147 Or App at 397. It also stated that "on *de novo* review, we agree with the trial court's factual conclusions." *Id.* at 391 n 1. In contrast, the trial court specifically found as follows:

> "There is no convincing evidence that the Fryers were even aware that the * * * easement was located on their property. They did have a survey done in 1960 [*sic*], which, to one with some experience in surveys, showed the * * * easement located on the Fryer[s'] property. However, the Court finds that most probably the Fryer[s] assumed, as did everyone else, that the North line of their property was the east/west fence on the North side of the paved * * * road."

That finding is consistent with the Court of Appeals' conclusion, and is supported by evidence in the record. Because the Fryers subjectively but mistakenly believed that the private road was located within the easement area and that they held an unencumbered title to the 20-foot strip of property south of the private road, their use of that disputed strip was hostile.

For the same reasons, we are unpersuaded by defendants' argument that plaintiffs' adverse possession claim fails because the Fryers' use of the property was not sufficiently inconsistent with the right to use the easement. The degree to which the possessor's use is inconsistent with the dominant estate holders' rights is relevant only to show adverseness or hostility. Here, plaintiffs have demonstrated hostility through the doctrine of "pure mistake." Moreover, none of the cases cited by defendants pertaining to the treatment of so-called unused easements[6] by courts in other jurisdictions involves a situation where all parties were mistaken as to where the actual right of way was located.

---

[6] The holdings in those cases also are premised on the fact that the need for the right of way had not yet arisen and, therefore, the easement was unused at the time of the adverse possession claim. Here, by contrast, the need for the right of way arose as soon as the Passons sold Tax Lot 100 to the Williams and virtually all parties, plaintiffs as well as defendants, thought that the actual easement was, in fact, being used.

Because the Fryers' use of the property was open, notorious, exclusive, and hostile and continued for the statutory ten-year period, we hold that the easement was extinguished by adverse possession during the Fryers' ownership. Accordingly, so long as plaintiffs can establish privity between the Fryers and the Hendricksons and the Hendricksons and themselves, they succeed on their claim. Defendants contend that plaintiffs cannot do so, however, even assuming that the Fryers acquired title to the easement strip during their period of ownership.

██ ██ Defendants acknowledge that an owner of property may tack his or her ownership to that of a predecessor in privity with him or her in order to transfer an adverse possessor's fully vested rights. *Evans v. Hogue*, 296 Or 745, 755, 681 P2d 1133 (1984). They argue, however, that plaintiffs, who have not, themselves, owned the property for 10 years, cannot tack their ownership to that of their predecessors, the Hendricksons, because there is no evidence that the Hendricksons intended to pass on any adverse possessory rights that they might have acquired from the Fryers, or even that they knew that they had acquired any such rights. Under the circumstances, defendants reason, there was no understanding on the part of the Hendricksons that they were transferring unencumbered title to the 20-foot strip and, therefore, plaintiffs are not in privity with them and cannot tack.

In support of the foregoing argument, as well as a second, independent point, defendants note that in 1982 the Fryers transferred the property "subject to" the easement and that the Hendricksons conveyed "except for" the easement in 1989. Defendants assert that the presence of that wording in those deeds is affirmative evidence that neither the Fryers nor the Hendricksons intended to pass unencumbered title. Additionally, defendants argue that each of those conveyances re-created the easement in their favor. Neither of those arguments is well taken.

In *Evans*, this court considered whether a deed that did not describe property acquired through adverse possession nevertheless operated to transfer the grantor's interest

in that property. This court held that, "where there is evidence of intent between grantor and grantee to transfer the grantor's interest in property, the grantee may acquire the grantor's interest, vested and complete." *Evans*, 296 Or at 756. In that case, this court concluded that evidence that the grantors intended to sell, and the grantees thought that they had bought, the land up to a presumed property line was sufficient to demonstrate the requisite intent.

In the present case, there was evidence that plaintiffs and all their predecessors in interest believed that the fence to the north of the private road was their property line, that the private road was constructed in the easement area, and that the area inside the 20-foot strip was unencumbered. Beginning with the Passons and continuing down the chain of title, all the owners of Tax Lot 300 behaved as if they had the exclusive right to use the 20-foot strip. They constructed, maintained, and extended the retaining wall and the fence, thereby obstructing the right of way, and they treated the property as part of their yard. Given the undisputed and universally held mistaken understanding as to the correct location of the easement, that evidence is sufficient to demonstrate that the grantors intended to pass unencumbered title to the strip and that the grantees thought that is what they were purchasing.

Neither does the existence of wording, both in the deeds from the Fryers to the Hendricksons and from the Hendricksons to plaintiffs, that referred to the extinguished easement alter our conclusion. Repeated reference in the deeds to the easement simply represents the perpetuation of Lewis Passon's original mistake. Each grantor was willing to acknowledge the existence of an easement, because each believed that the property line was the fence north of the private road and that the easement was located there. Under those circumstances, the references in no way constitute an acknowledgment of the continued existence of an easement over land to which each believed that he or she owned unencumbered title.

For the same reasons, the references in the 1982 and 1989 deeds to the extinguished easement do not operate to "re-create" the easement in favor of defendants. Generally,

once an easement is extinguished, it is gone forever. *Witt v. Reavis*, 284 Or 503, 509, 587 P2d 1005 (1978). Although Oregon courts have not before considered the question, courts in other jurisdictions virtually are unanimous in holding that a mere later reference to an already extinguished easement does not in itself re-create the easement. *See, e.g., Breliant v. Preferred Equities Corp.*, 918 P2d 314, 319 (Nev 1996); *Davis v. Henning*, 250 Va 271, 275, 462 SE2d 106, 108 (1995); *Seebaugh v. Borruso*, 220 AD2d 573, 574, 632 NYS2d 800, 801 (1995); *Bart v. Wysocki*, 558 So2d 1326, 1329 (La 1990); *Smith v. Tippett*, 569 A2d 1186, 1192-93 (DC App 1990); *Capital Candy Co. v. Savard*, 135 Vt 14, 16, 369 A2d 1363, 1365 (1976); *McCurdy v. Wheeler*, 235 F2d 22, 23 (DC Cir 1956) (all so holding). According to those courts, any such wording merely acknowledges the easement as a previously existing right burdening the property being conveyed. *Davis*, 250 Va at 275, 462 SE2d at 108; *Bart*, 558 So 2d at 1329. A grantor may re-create the easement *de novo*, but evidence of an intent to do so must appear on the face of the deed. *Seebaugh*, 220 AD2d at 574, 632 NYS2d at 801; *Bart*, 558 So 2d at 1329, *Riccio v. De Marco*, 188 AD2d 847, 849, 591 NYS2d 569, 571 (1992).

The foregoing analysis is similar to that in *Garza v. Grayson*, 255 Or 413, 467 P2d 960 (1970), in which this court held that an appurtenant easement may be created in favor of a third party to a transaction, so long as the grantor's intention to impose the servitude is apparent either from the face of the deed or from the surrounding circumstances. Here, defendants, third parties to the transactions between the Fryers and Hendricksons and the Hendricksons and plaintiffs, are arguing that the Fryers and the Hendricksons created an appurtenant easement in their favor by referring to the easement in their deeds. However, no actual intention to impose such a servitude is apparent, either on the face of the deed or from the surrounding circumstances. Indeed, just the opposite is the case. The deeds merely describe the easement by reference to the 1957 deed conveying Tax Lot 100 from the Passons to the Williams. The surrounding circumstances establish that that wording is merely a perpetuation of the Passons' original mistake as to correct location of the northern boundary of Tax Lot 300, and that neither the

Fryers nor the Hendricksons intended to convey an additional easement that would allow a roadway to be constructed to within seven feet of their house.

Neither the 1982 nor the 1989 deed re-creates an easement in defendants' favor *de novo*. Accordingly, plaintiffs have established the requisite privity between themselves and the Hendricksons and between the Hendricksons and the Fryers so as to allow them to tack their ownership to that of their predecessors in interest. They therefore are entitled to claim unencumbered title to the 20-foot strip of land along the northern boundary of Tax Lot 300.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed. The case is remanded to the circuit court for entry of a judgment quieting title to the disputed parcel in favor of plaintiffs.