Argued and submitted January 27, reversed and remanded on appeal; cross-appeal dismissed as moot October 4, 2000

## MID-VALLEY RESOURCES, INC.,
### an Oregon corporation,
*Appellant - Cross-Respondent,*

*v.*

### Dorothy Evelyn ENGELSON,
### Trustee of the Dorothy Engelson Trust;
### Sandra Engelson; and Cheryl Engelson,
*Respondents - Cross-Appellants.*

(97 05 143; CA A104140)

13 P3d 118

Thomas C. Tankersley argued the cause for appellant - cross-respondent. With him on the briefs was Drabkin and Tankersley.

Gary Kahn argued the cause for respondents - cross-appellants. On the briefs were Peggy Hennessy and Reeves, Kahn & Eder.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

## KISTLER, J.

Plaintiff initiated this action to obtain a declaration that it is the owner of a disputed parcel of property and to enjoin defendants from trespassing on, asserting ownership rights in, and interfering with its use of that parcel. Defendants asserted a counterclaim that they, or their predecessors, had adversely possessed the disputed parcel of property. The trial court concluded that defendants acquired title to the disputed parcel by adverse possession and entered a judgment in their favor. Plaintiff appeals and we reverse.

Plaintiff purchased tax lots 1800 and 1803 in 1994.[1] The disputed parcel of property consists of the eastern portion of plaintiff's lots and ranges from 77.66 feet wide at the north end to 184.4 feet wide at the south end. Defendants' property, tax lot 2000, borders the disputed parcel on the east. A 20-foot easement exists on the disputed parcel close to the eastern boundary of tax lots 1800 and 1803. There was testimony that at one time there were two fences on the disputed parcel with a road running between them. Defendants contend that the fence line west of the road is the boundary of their property.

Glen and Eva Drake, who are defendant Dorothy Engelson's parents and defendants Cheryl and Sandra Engelson's grandparents, began renting property that included tax lot 2000 in 1924 or 1925. The Drakes purchased

---

[1] The disputed parcel and adjacent tax lots are shown on the map below.

(Not to scale)

the property in 1930. From 1924 or 1925 to approximately 1963, the Drakes operated a dairy farm on the property. There was testimony at trial that during the period from 1925 to 1937 defendant Dorothy Engelson and her sister, Genevieve Slaughter, picked berries, apples, hazelnuts, and wild flowers, rode horses, and ran cattle on the disputed parcel. Sometime during that period, from 1925 to 1937, the Drakes rented additional property west of tax lot 2000 on which to run their dairy cattle. The parties disagree whether the property the Drakes rented included the disputed parcel or whether the Drakes only rented plaintiff's property west of the disputed parcel.

After her husband died, Eva Drake gave tax lot 2000 to her daughter, Dorothy Engelson. Between 1976 and 1980, Cheryl Engelson or her sister Sandra Engelson visited tax lot 2000 at least every other day. During that time period, they exercised their dog, rode motorcycles, gathered firewood, and cleared pathways on the disputed parcel. All three defendants moved to tax lot 2000 in 1980. After moving to the property, defendants claim that their use of the disputed parcel intensified and included exercising their dogs, gathering firewood, picnicking, picking apples, picking and planting flowers, and maintaining trails. In 1985, defendants built a dog pen partially on the disputed parcel. In 1994, Dorothy Engelson sold tax lot 2000 on a land sale contract to her daughter Cheryl Engelson. Sandra Engelson, pursuant to an oral agreement with her sister Cheryl, assists in making payments on the property and will eventually become a co-owner of record.

The trial court concluded that defendants had "prove[d] by clear and positive evidence that they, or their predecessors, have had actual, open, notorious, exclusive and continuous possession of the [disputed] property for a ten-year period, beginning in 1925." The court further concluded that, "even if Defendants had not met their burden of proof prior to 1976, there was sufficient evidence to establish a claim for adverse possession of the disputed parcel from 1976 to 1986." The trial court entered a judgment declaring that defendants own the disputed parcel in fee simple subject to all easements of record affecting that parcel.

■     On appeal, plaintiff asserts that the trial court erred in declaring that defendants are the owners of the disputed property without finding that defendants' possession was hostile. Defendants initially responded, in their brief, that because they had established open and continuous possession for at least 10 years, there was a presumption of hostility. At oral argument, however, defendants acknowledged that, in light of the Supreme Court's recent decision in *Hoffman v. Freeman Land and Timber, LLC*, 329 Or 554, 994 P2d 106 (1999), no presumption of hostility arises from open and continuous possession in an adverse possession case. Defendants continue to argue, however, that their use of the property satisfied the requirement of hostility. We review *de novo*. ORS 19.415(3).

■■     "Defendants bear a 'heavy burden' to establish ownership by adverse possession." *Hoffman*, 329 Or at 560. To acquire fee simple title to real property through a common-law claim of adverse possession, defendants "must establish, by clear and convincing evidence, that the use of the property was actual, open, notorious, exclusive, continuous, and hostile for a 10-year period."[2] *Id.* at 559; *accord Zambrotto v. Superior Lumber Co., Inc.*, 167 Or App 204, 208, 4 P3d 62 (2000).

In *Hoffman*, the court held that, in adverse possession cases, open and continuous use does not give rise to a presumption of hostility. *Hoffman*, 329 Or at 563.[3] After

---

[2] The elements for establishing a statutory adverse possession claim are prescribed by ORS 105.620. To establish an adverse possession claim under ORS 105.620, however, defendants must establish not only that their possession was open, notorious, exclusive, hostile, and continuous for at least 10 years, but also that their possession was taken under an honest belief that they owned the disputed parcel, that their belief continued through the vesting period, and that their belief had an objective basis and was reasonable under the circumstances. ORS 105.620(1)(b); *Zambrotto*, 167 Or App at 208. Because the time frames for establishing adverse possession relied on by defendants, 1925-35 and 1976-86, do not extend beyond January 1, 1990, ORS 105.620 does not apply. *See* Or Laws 1989, ch 1069, § 4.

[3] The trial court, acting in accordance with our earlier decisions in *Hoffman v. Freeman Land and Timber, LLC*, 156 Or App 105, 113, 964 P2d 1144 (1998), *rev'd* 329 Or 554, 994 P2d 106 (1999), and *Meier v. Rieger*, 152 Or App 312, 318, 954 P2d 786, *rev den* 327 Or 431 (1998), and without the benefit of the Supreme Court's decision in *Hoffman*, apparently presumed hostility from the fact that defendants used the property openly and continuously for a 10-year period. The Supreme

*Hoffman*, defendants may establish "hostility" in one of two ways. They may rely on the "pure mistake" doctrine, which, if established, obviates the need to prove an actual or subjective intent to possess the property as its true owner. *See Faulconer v. Williams*, 327 Or 381, 390-91, 964 P2d 246 (1998). If they cannot bring themselves within the pure mistake doctrine, then they must establish hostility by demonstrating a subjective intent to possess the property as its true owner. *Hoffman*, 329 Or at 561; *Faulconer*, 327 Or at 391. We begin with the pure mistake doctrine.

■■■ Under the "pure mistake" doctrine, possession under a purely mistaken belief of ownership will satisfy the element of hostility. *Faulconer*, 327 Or at 391 (quoting *Norgard et al v. Busher et ux*, 220 Or 297, 303, 349 P2d 490 (1960)). The "pure mistake" doctrine provides that, when a party possesses the land under the mistaken belief of ownership, the court does not inquire whether that party intended to possess the property as its true owner. *Id.* at 389. The mistaken belief, however, must be a pure mistake, not a mistake based upon conscious doubt. *Id.* at 390-91. A pure mistake exists when a person taking property under a deed that properly identifies the boundaries "actually occupies other property that he mistakenly believes is covered by the deed." *Id.* at 390.

■■ Defendants primarily rely on two time periods, 1925 to 1935 and 1976 to 1986, to establish their adverse possession claim.[4] The Drakes leased their property from 1924 or 1925 until they purchased it in 1930. Because the Drakes knew they did not own tax lot 2000 initially, they could not have had a mistaken belief that they owned the disputed parcel before 1930. At best, the Drakes may have believed that the disputed parcel was part of the property they were renting. The record also provides no evidence that the Drakes

Court's decision in *Hoffman*, however, makes clear that no such presumption exists. *See* 329 Or at 563.

[4] Defendants argue alternatively that they established their adverse possession claim after 1990 because they "have been living in close proximity to, and actually using, the Disputed Parcel as their own from May, 1980 to present." It is undisputed, however, that plaintiff purchased tax lots 1800 and 1803 in 1994 and that plaintiff examined and surveyed the property, including the disputed parcel, after that time. Defendants do not argue that their possession of the disputed parcel was exclusive after 1994. Accordingly, we do not consider any events that occurred after 1994. *See* ORS 105.620(1)(a).

mistakenly believed they owned the disputed parcel after purchasing the property, including tax lot 2000, in 1930.[5] Defendants cannot rely on the pure mistake doctrine to establish hostility during the period from 1925 to 1935.

The trial court concluded that, even if defendants had not adversely possessed the property before 1976, "there was sufficient evidence to establish a claim for adverse possession of the disputed parcel from 1976 to 1986." We therefore turn to whether Dorothy Engelson, who owned the property during that period, was under a purely mistaken belief of ownership of the disputed parcel.

Dorothy Engelson's testimony clearly establishes that she had conscious doubt as to where the property line was. She testified, through a perpetuation deposition, that as a child living on the property she did not know where the boundary line to her parents' property was but that she thought it was "all ours." Also, when asked whether the fence was the boundary between her parents' property and the property to the west, she answered that she did not know. In *Norgard*, the court explained that "[w]here an occupant of land is in doubt as to the location of the true line it is reasonable to inquire as to his state of mind in occupying the land in dispute." 220 Or at 301. Because Dorothy Engelson's testimony establishes that she was in doubt as to the location of the true line, defendants cannot rely on the pure mistake doctrine to satisfy the requirement of hostility.

Without the aid of the pure mistake doctrine, defendants must establish by clear and convincing evidence that their possession was hostile or their claim of adverse possession fails. *See Hoffman*, 329 Or at 563. "[T]he element of hostility is met when the claimant intends to occupy the land as the owner and not in subordination to the true owner." *Faulconer*, 327 Or at 391. To establish hostility, a claimant must demonstrate a subjective intent to possess the property as its true owner. *Id.* at 389.

The strongest evidence that defendants intended to possess the disputed parcel as a true owner is evidence that

---

[5] Dorothy Engelson testified in her deposition that her parents never talked about where the property line was.

their predecessors in interest maintained fences on the parcel.[6] In *Nooteboom v. Bulson*, 153 Or App 361, 365, 956 P2d 1042, *rev den* 327 Or 431 (1998), however, the court noted that the significance of a fence depends, in part, on what the fence communicates to others about possession of the disputed property. Here, although defendants base their argument on a fence that existed on the west side of the easement on the disputed parcel, there was evidence that at one time there were two fences, one on either side of the fire road on that easement. That evidence suggests that the purpose of those fences was to border the road, not to establish defendants' property line. Under those circumstances, maintenance of the fences on the disputed parcel does not establish that defendants, or their predecessors in interest, intended to occupy the land as its true owner.

■    Finally, in *Hoffman*, grazing cattle, maintaining an existing fence, timber thinning, occasionally clearing brush, and posting "no trespassing" signs on the disputed property was not persuasive evidence of intent to possess the property as a true owner. 329 Or at 558, 563-64. We see no reason to reach a contrary conclusion based on more minimal activities on the disputed parcel by defendants or their predecessors in interests. Defendants failed to prove hostile possession by clear and convincing evidence.[7] Their adverse possession claim fails.

Reversed on appeal and remanded for entry of judgment for plaintiff; cross-appeal dismissed as moot.

---

[6] Defendants assert that they established a claim for adverse possession of the disputed parcel from either 1925 to 1935 or 1976 to 1986. To the extent that the dog pen built partially on the disputed parcel is evidence of hostility, that pen was not built until as late as 1985 or 1986. Because defendants' interest in the disputed parcel through adverse possession could not vest after 1994, *see* n 4 above, the dog pen does not assist defendants in this regard. *See Zambrotto*, 167 Or App at 208 (discussing the requirements for establishing a claim for adverse possession). Similarly, any logging that occurred on the property in 1988 also does not assist defendants in establishing the necessary hostility.

[7] Because we conclude that defendants' claim for adverse possession of the disputed parcel fails, defendants' cross-appeal is moot.