Argued and submitted January 3, affirmed April 3, 2003

Robert J. GILINSKY,
*Appellant,*

*v.*

Martin L. SETHER;
Samuel Groves; Bobbe Groves;
Donald Joseph Hess, and Robert W. Bucan, Trustee,
*Respondents.*

00-0620-E-1; A114803

66 P3d 584

Charles M. McNair argued the cause for appellant. With him on the briefs were Sandra E. Rice, and Fowler & McNair, LLP.

Pat Wolke argued the cause and filed the brief for respondents.

Before Edmonds, Presiding Judge, and Kistler and Schuman, Judges.

EDMONDS, P. J.

### EDMONDS, P. J.

Plaintiff appeals the trial court's judgment that adjudicated defendants to be the owners of certain property through adverse possession. He argues, in part, that the evidence presented by defendants at trial was insufficient to prove 10 continuous years of open, notorious, and hostile possession of the disputed strips of land before 1990 by clear and convincing evidence.[1] We affirm.

We find the following facts on *de novo* review. ORS 19.415(3); *Brunswick v. Rundell*, 126 Or App 582, 585, 869 P2d 886 (1994). All the property at issue is located in a forested rural residential area of Jackson County. The property is not used for agricultural purposes. Like the land in the surrounding area, the subject parcels each consists of several acres and is used as a single family residence.

Plaintiff purchased his undeveloped parcel of land in 1998. The land is forested with dense underbrush. At the time he purchased it, the land had never been developed and showed no signs of human inhabitancy. Plaintiff had a survey done soon after he acquired the land. That survey revealed that the existing fence lines of adjoining properties encroached on his property. The encroachments, evidenced by fence lines, involve four parcels of property, each owned by different defendants: Martin Sether, Robert Bucan, Donald Hess, and Samuel and Bobbe Groves. The fence lines encroach on plaintiff's property as indicated in the following diagram.

---

[1] Defendants claim under the doctrine of common-law adverse possession, which requires that title in the land vested before January 1, 1990. Or Laws 1989, ch 1069, § 4, *compiled as a note after* ORS 105.620.

A.   The Sether Property

Sether acquired his property in 1995. At that time, the fence appeared to be very old. The disputed area is in a meadow that functions as the backyard for the Sether residence. Sether mows the disputed area and attempts to keep weeds off of it. There is a line of young fir trees in the area that appears to have been intentionally planted and that was on the property when Sether acquired it. There is a visible difference between the use of the disputed property and the use of the Gilinsky property on the other side of the fence, which is densely forested.

James Hendricks, who owned the Sether property from 1972 until 1976, testified at trial. After 1978 and until the time of trial, Hendricks also lived about 150 yards away from the Sether property. At the time that he owned the Sether property, Hendricks considered the disputed area to be part of his backyard. Like Sether, he mowed the area and kept weeds off of it. He said that the Gilinsky side remained heavily forested, while the Sether side, including the disputed property, was cleared and maintained during the relevant time period. Hendricks also testified that the condition of the Sether property and the Gilinsky property is the same now as when he lived there. Both Sether and Hendricks testified that, when they purchased the Sether property, they were told that the fence line was the boundary line of the property and that they always believed that they owned the property up to the fence.

B.   The Bucan Property

Bucan acquired his property in early 1980. He always believed that he owned the property up to the fence line. The fence on that portion of the disputed property was built in the mid-1950s by Alfred Kaelin, who owned the Gilinsky property at that time, and by Jacob Owens, who owned the Bucan property at that time, and by two other individuals, who owned land nearby. Bucan mowed, planted trees, stored lumber, and gardened in the disputed area after taking possession in 1980. According to his testimony, there is a visible difference between his use of the disputed property and the use of the property on the Gilinsky side of the fence, which is overgrown, brushy, and forested.

Sam Groves testified that he observed the use of the Bucan property over the past 40 years. He testified that the use has been "normal rural activit[ies]" such as storage and gardening. According to him, there has been no interruption in the use of the land for the past 40 years, and the nature of the use has not changed over that period of time. Bobbe Groves also observed the use of the Bucan property over the years since 1948. She testified that the previous owners used the property just as the Bucans use it and that it always has been used up to the fence line.

## C. The Hess Property

Hess acquired his property in 1989 from William Dolmage. Dolmage acquired the Hess property in 1970 from Myron Sukow. Both individuals understood their property to extend to the fence line. When Dolmage took possession of the Hess property, it had no house or human inhabitants. In 1970, Dolmage installed an underground septic system consisting of a septic tank and drain field on the disputed portion of the property. Since 1970, the flat area above the septic system has been used as a parking area and turn-around spot for vehicles.[2] At the time that the septic system was installed, Dolmage also put in a driveway and built a house on the portion of Hess property that is not in dispute. He also had his sons, together with the then-owner of the Gilinsky property, extend the existing fence line. A friend of his, who was a surveyor, "sh[o]t a line" up the hill on which they built the fence. The existing fence was used as a starting point for that line. Dolmage measured the property, which he understood should be 250 feet wide, to make sure that the fence was being put in the proper place. He testified that the fence was intended as a boundary line between the two properties and he would have moved the fence if he had determined that it

---

[2] Hess testified that, before he began parking cars in the disputed area, Dolmage used it for parking and a turn-around spot:

"Q. When Mr. Domage was there that was still a parking area?

"A. Yes. He had used it for cars, vehicles also.

"Q. He used it for a parking area and when you moved on, you used it as a parking area?

"A. Yes. If * * * you come up the driveway you'll see how there's not much room to turn around up there. You have to come up my driveway, facing my house, you'd have to back down into that spot in order to get out of there."

was in the wrong place. Sam Groves testified that the disputed portion of the Hess property has been used for parking and other "normal rural use[s]." Bobbe Groves testified that, when her father, Sukow, owned the Hess property, he cut down trees in the disputed area. In 1983, Dolmage put a shed and a satellite dish on the disputed area. There is also a cross fence on the Hess property. The shed, satellite dish, and parking were placed on the west side of the cross fence. On the east side of the fence, the Hess property remains brushy and overgrown. Also, on the plaintiff's side of the fence, the property has not been developed and remains heavily wooded.

### D.   The Groves Property

Sukow, Bobbe Groves father, acquired the Groves property in 1948, and Bobbe Groves began living on it at that time. Sukow, who is presently severely impaired by Alzheimer's disease, was unavailable to testify at trial. The Groveses acquired the property from Sukow in 1985. Sukow continues to live on the property, and Sam and Bobbe Groves continue to visit on a weekly basis. Their duration of contact with the property is between 40 and 50 years. They testified that the fence lines have been on the property as long as they can remember and have remained in the same location. Sukow used the disputed area adjoining the Groves property as his own. As children, Bobbe Groves and her sister played in the disputed area, and Sukow cut firewood there. He also mowed and maintained the area and planted trees. Bobbe testified that she and her sister had a playhouse in the disputed area when they were children. Further, Sukow constructed a lane in the late 1970s, that is situated alongside the fence in the disputed area of the property. He granted Dolmage an easement to use the lane for ingress and egress to the Hess property. Sukow himself also used the lane and mowed the area beside it up to the fence. The property on the other side of the fence was undeveloped and heavily wooded. When the property was transferred to the Groveses, they believed that the fence line was the property line.

After the survey of his land revealed the encroachments, plaintiff sued defendants for trespass and ejectment. Defendants filed counterclaims asserting ownership to the

disputed areas by adverse possession, and they sought a judgment quieting title to the disputed areas. Each defendant claimed ownership of the disputed area adjoining his own property.

After trial, the trial court held that Sether, Bucan, and Groves had each obtained title by adverse possession of the strips of disputed property adjoining their respective properties. As to Hess, the trial court held that he acquired title by adverse possession to the portion of the disputed property west of the cross fence but did not have title to the area east of the cross fence. The court explained:

> "The fences all are old on all perimeters and were intended clearly as boundary fences. They haven't been moved. It was clear to [plaintiff], as it was clear on viewing the properties, that these owners intended these fences to define their areas of use. The enclosed areas were all used appropriately for land of its type. This all goes to the issue of hostility which is satisfied by the quite clear demarcation of the boundaries and by the use of the properties enclosed. Notice was given to prospective successors in interest by these boundaries."

However,

> "[t]he exception is the easterly portion of the disputed strip lying between [the Hess property] and [plaintiff]. This rear strip was different from the other disputed strips. * * * The only use of this strip apparently has been occasional cattle grazing. But the small gate between Hess'[s] home and this Easterly property was clearly not a cattle type gate. A potential buyer of the [plaintiff's] property would not see the same diversity of use between the two sides of this fences that was apparent throughout the other fence lines."

Plaintiff appeals, making several arguments. First, he argues that the evidence presented by defendants was not sufficient to establish 10 years of open and notorious possession. Second, he argues that the evidence presented by defendants did not establish the hostile intent required to obtain property by adverse possession. Next, he argues that Bucan and Groves did not prove by clear and convincing evidence that their predecessors intended to convey more property than the property described in their deed. Finally, plaintiff

argues that the trial court erred in failing to enter judgment in his favor on his claims for trespass and ejectment.

■ To establish title to the disputed property by adverse possession, defendants must show, by clear and convincing evidence, actual, open, notorious, exclusive, continuous, and hostile possession of the property for a 10-year period. *Hoffman v. Freeman Land and Timber, LLC*, 329 Or 554, 559, 994 P2d 106 (1999). A party who claims title to land by adverse possession must "use or occupy the land as an average owner of the same type of land would use it." *Nooteboom v. Bulson*, 153 Or App 361, 364, 956 P2d 1042, *rev den*, 327 Or 431 (1998). An adverse possessor's use of property is open and notorious if it "is 'of such a character as to afford the [owner] the means of knowing it, and of the claim.'" *Hoffman*, 329 Or at 560 (quoting *Hicklin v. McClear*, 18 Or 126, 138, 22 P 1057 (1889)) (alteration in *Hoffman*). Limited use can satisfy the requirement of open and notorious use if its nature would put the actual owner "on notice that his or her title is being challenged." *Id.* at 560; *Reeves v. Porta*, 173 Or 147, 153, 144 P2d 493 (1944).

■ All the land at issue in this case was "actually" used as part of "backyard" areas for defendants' respective residences. Moreover, in our view, the mowing and maintenance of the strips, as well as their use for gardening, storage, parking, and recreation are all sufficient to show open and notorious use. Further, the placement of the fences, when taken with the testimony of all the witnesses in this case, establishes defendants and their predecessors in interest believed the fences to be boundary fences, not merely fences of convenience. The contrast between the disputed property on defendants' side of the fence and the densely wooded property on plaintiff's side of the fence corroborates our conclusions; they clearly gave any observer notice of defendants' use of and claim to the disputed strips of property. Consequently, we have no difficulty in finding under the above circumstances that defendants' use was open and notorious.

To succeed in their claims of adverse possession, defendants also must show that their open and notorious use of the land continued for at least 10 years before 1990. The direct and circumstantial evidence presented by defendant

Sether establishes that the open and notorious use of the property he claims began by 1972, when Hendricks acquired the property, and that it continued until the time of trial, or well beyond the required 10-year period. Similarly, the testimony of defendant Bucan as to his use of the property since 1980, along with the testimony of Bobbe and Sam Groves regarding the use of the property beginning in 1948, clearly establishes the 10-year continuous use element of the test. Bobbe and Sam Groves also testified about the use of the Groves property since 1948 and 1960. That use of that property has remained the same over the 50 years preceding trial.

With regard to the Hess property, although the shed and satellite dish were not put in place until 1983, the septic system was installed on the disputed portion of the property in 1970. However, we question whether an underground septic system by itself constitutes an open and notorious use of a disputed parcel of property. Nonetheless, the area above the septic system was used for parking and turning cars around. The circumstantial evidence establishes that that use began when Dolmage built the house on the property. Hess testified that Dolmage used the disputed area for parking and that, because of the way that the driveway and house are situated, it is necessary to use the disputed area as a turn-around spot in order to drive a vehicle off the property. We are persuaded that, when the evidence of the use of the Hess property is considered as a whole, the requirement of at least 10 years of open and notorious possession before 1990 is satisfied.

To establish the element of hostility, a claimant must show that he or she "possessed the property intending to be its owner and not in subordination to the true owner." *Faulconer v. Williams*, 327 Or 381, 389, 964 P2d 246 (1998). Alternatively, "possession [of property] under a purely mistaken belief of ownership" satisfies the hostility requirement. *Mid-Valley Resources, Inc. v. Engelson*, 170 Or App 255, 260, 13 P3d 118 (2000), *rev den*, 332 Or 137 (2001). A pure mistake exists where a claimant takes property under a deed and "occupies other property that he mistakenly believes is covered by the deed." *Faulconer*, 327 Or at 390.

As stated above, the fences in this case were thought to be boundary fences by defendants and their predecessors

in interest. The fences, in most areas, run parallel to the actual property lines. The extension of the fence in 1970, which was accomplished through the cooperative efforts of Dolmage and Kaelin, plaintiffs' predecessor in interest, also indicates that over the years, they had been considered the boundaries for the properties. Groves testified that, since 1948, her father used the disputed area of the property as his own. Further, Sukow made improvements to the property within the disputed area, and he gave an easement to Dolmage to use the lane. Bobbe also testified that Jake Owens, Bucan's predecessor in interest, used the disputed portion of the Bucan property as his own. In sum, all the facts and circumstances in this case clearly establish the element of hostility due to pure mistake with regard to the disputed areas.

■ ■ Plaintiff next argues that defendants Groves and Bucan did not receive from their predecessors in interest any property interest in the disputed areas that had vested by adverse possession. An owner who acquires title to property by adverse possession may transfer that title to third parties:

> "[W]here there is evidence of intent between grantor and grantee to transfer the grantor's interest in property, the grantee may acquire the grantor's interest, vested and complete, in those situations in which the grantor has adversely possessed for the statutory period."

*Evans v. Hogue*, 296 Or 745, 756, 681 P2d 1133 (1984). We find that the requisite intent to transfer the disputed property is clearly proved by the circumstantial evidence in the record. As discussed above, the fence lines on both the Bucan and Groves properties were thought to be boundary fence lines. It is clear from the evidence that the owners of the properties believed, albeit mistakenly, that their deeds conveyed land up to the fence line. Their predecessors in interest had always used the land up to the fence line, acting as the owners of the disputed portions of the property. The use of the respective properties has remained the same, some for as long as 50 years. Also, both Bucan and the Groves testified that they believed that the property up to the fence line had been conveyed to them by their predecessors in interest. Under the circumstances, the transfers of the properties by

deed were sufficient to indicate an intent to transfer the disputed portions of the property.

■ In his final assignment of error, plaintiff argues that the trial court erred in not entering a judgment in his favor on his ejectment and trespass claims. In part, he explains that "[t]he trial court erred in failing to rule on plaintiff's claim for statutory ejectment and common law trespass as to the property withheld from the plaintiff but not adversely possessed by defendant Hess."[3] We perceive plaintiff to argue that the trial court erred in failing to award damages for the portion of the property that it found Hess had occupied but for which the elements of adverse possession were not satisfied. Although plaintiff argues that the court should have awarded damages for that portion of his trespass and ejectment claims, he fails to point to any specific evidence of damages in his argument, stating only that "[p]laintiff presented ample evidence to establish damages for ejectment and trespass." The portion of the disputed property that was not adversely possessed by Hess has not been developed. In fact, the trial court reasoned that the land had not been adversely possessed because

> "[t]he only use of [the] strip apparently has been some occasional cattle grazing. * * * A potential buyer of the Gilinsky property would not see the same diversity of use between the two sides of this fence that was apparent throughout the other fence lines."

Because we find no evidence of damages in the record, and plaintiff fails to point to any such evidence, we hold that the trial court did not err in failing to award damages to plaintiff regarding the portion of the Hess property found not to be adversely possessed.

Affirmed.

---

[3] In its order, under the heading "Damage Claims," the trial court wrote:

"Because of these findings [on the adverse possession claims], [plaintiff] will receive no damages on his claims."

Further, the judgment stated that

"The Court finds for the Defendants and against the Plaintiff, with respect to Plaintiff's claim for damages against Defendants."