464

Argued and submitted April 7, reversed and remanded in part; otherwise affirmed
September 8, 2005

Lisa HARRELL
and John T. Harrell,
*Appellants,*

*v.*

Glen TILLEY,
individually;
Glen Tilley,
trustee of the Gladys E. McKheen Family Trust;
and Keith Tilley,
*Respondents,*

*and*

John DOE
and Jane Doe,
claiming by and through the heirs
and assigns of J.L. Jones;
also other persons or parties unknown
claiming any right, title, lien, or interest
in the property described in the Complaint herein,
*Defendants.*

02C-14354; A123832

119 P3d 251

Edward F. Schultz argued the cause for appellants. With him on the briefs were Andrew J. Bean and Weatherford, Thompson, Cowgill, Black & Schultz, P.C.

Michael J. Martinis argued the cause for respondents. With him on the brief was Webb, Martinis & Hill.

Before Haselton, Presiding Judge, and Linder, Judge, and Breithaupt, Judge pro tempore.

HASELTON, P. J.

## HASELTON, P. J.

In this action to quiet title to a strip of land lying between plaintiffs' and defendants' deeded lots, plaintiffs appeal from a judgment awarding both parties joint ownership of the disputed strip.[1] Plaintiffs contend that they are entitled to sole ownership by virtue of their predecessor's adverse possession of the strip or, alternatively, by virtue of quitclaim deeds that they subsequently acquired from the heirs of one of the record title holders. Plaintiffs also contend that Oregon law does not recognize a cause of action for "mutual adverse possession"—as pleaded in defendants' counterclaim and recognized by the trial court—and that, even if such a claim were cognizable in the abstract, the circumstances of this case do not warrant such an award. As explained below, we conclude that (1) the trial court's finding of mutual adverse possession and its consequent award of joint ownership were improper; (2) plaintiffs were not entitled to prevail on their claims of sole ownership by virtue of adverse possession; and (3) due to its erroneous "mutual adverse possession" determination, the trial court failed to fully address plaintiffs' quiet title claim. Accordingly, we reverse and remand.

On *de novo* review, *Clark v. Ranchero Acres Water Co.*, 198 Or App 73, 75, 108 P3d 31 (2005), we find that the testimony and exhibits submitted at trial establish the following facts:

Plaintiffs and defendants own adjacent parcels of land near Jefferson in Marion County. A strip of land approximately 27 feet wide and 1,666 feet long lies between the eastern edge of defendants' property (Parcel 1) and the western edge of plaintiffs' property (Parcel 2). The parties uniformly refer to that strip—which encompasses roughly one acre—as

---

[1] As used in this opinion, the term "defendants" refers to Glen Tilley, both individually and as trustee of the Gladys E. McKheen Family Trust, and Keith Tilley (the Tilleys). Both plaintiffs and defendants have also pleaded claims against "John Doe and Jane Doe, claiming by and through the heirs and assigns of J.L. Jones" (the Jones heirs). No appearance was made by the Jones heirs, who, at the time of trial, were unknown to any of the parties or the court, and a default order against them was entered before trial. The Jones heirs have not filed any appearance on appeal.

"the Gap." An irrigation well, powered by an electrical line running across Parcel 1, is located near the center of the Gap.

The Gap was created when the original common owner of the two parcels, J.L. Jones, transferred Parcel 1 to G.W. Burres in 1910 and Parcel 2 to William Kerr in 1911. For reasons unknown (or, at least, undisclosed in the appellate record), Jones, in creating and conveying the two parcels, did not convey all of his property. Rather, he left a strip of land between the two titles—the strip at issue here and now known as the Gap—to which Jones retained title. There is no evidence as to whether either Burres or Kerr was aware that there was any property between Parcels 1 and 2. In any event, as described below, their respective successors-in-interest did not become aware of the Gap until decades later.

E.O. Kerr acquired Parcel 2 from William Kerr in 1938. From that date until approximately 1959, E.O. Kerr used the Gap as a driveway to gain access to his residence—located on the southern portion of Parcel 2—from a county road that runs along the north edge of both parcels. Kerr rented the arable acreage of Parcel 2 to various tenant farmers. Darlene Jacobson testified that her father rented and farmed both Parcel 1 and Parcel 2 when she was a child, and that between 1938 and 1956 her father also used the "hard-packed dirt" road through the Gap to gain access to Parcel 2. There is no evidence in the record as to who built the road, when it was built, or for what purpose it was built. Jacobson testified that she rode her bike on the Gap road, despite the fact that her father "didn't like me to be there" because "it was Mr. Kerr's driveway, back to his house."

In 1952, Kerr paid to have a well drilled on the east side of the Gap road to provide irrigation for Parcel 2 and registered that well in his name. Since at least 1958, a power line running across Parcel 1 has provided power to operate the Gap well. Owners and lessees of the two parcels have both used water from the well for irrigation purposes.

In the mid-1950s, defendant Glen Tilley's father, Roy Tilley, began leasing Parcel 1 from its then-owner, August Hines. In 1956 and 1957, Roy Tilley also rented Parcel 2 from Kerr and farmed that land. In 1958, Roy Tilly purchased Parcel 1 from Hines. According to Glen Tilley's

testimony, the Tilley family became aware at that time that there was a gap of title ownership between the two parcels.[2]

Glen Tilley also testified that his family began using the road running through the Gap when they started farming "the fields in that area"; that the Tilleys "used it all the time after that" for access to Parcel 1; and that the road "was used as a farm road by every farmer that farmed, whether it was Kerr's, ours or before us."

That apparently cooperative and mutually nonexclusive use of the Gap by the owners of Parcels 1 and 2 continued for the rest of the twentieth century. After E.O. Kerr died, his estate sold Parcel 2 to D.H. and Elsie D. Edwards in 1963, who then sold it to Vernon McKheen in 1964. McKheen was married to Roy Tilley's sister and continued the practice of leasing Parcel 2 to various farmers, including the Tilleys. According to McKheen, while the Tilleys were leasing and farming Parcel 2, they used the well and the Gap road to irrigate and access Parcel 2.

In contrast to the Tilleys, who were somehow aware (at least from 1958 on) of the existence of the Gap, the record does not establish such knowledge by Kerr or his successors. In particular, although there is evidence that Kerr and his tenants used the Gap road, there is no evidence that Kerr knew he did not own the property underlying that road. If Kerr did, in fact, have such knowledge, he did not transmit it to his successors in interest: McKheen testified that he first became aware of the Gap in 1972, when he had Parcel 2 surveyed in connection with a sale of a portion of his property to his stepson. That survey revealed the existence of the Gap between the two properties as described in their respective

---

[2] In response to questioning from his own counsel, defendant Glen Tilley testified:

"Q: Now, when you were farming the property, both parcels at this time, were you aware that there was a gap in title ownership between them?

"A: Yeah.

"Q: When did you first come to have any knowledge to that effect?

"A: Probably in '58 when Dad bought [Parcel 1]. We were—we always had knowledge that there was a gap there.

"Q: How did it come to your knowledge?

"A: I don't know."

deeds. McKheen never claimed ownership of the Gap. In fact, when McKheen sold Parcel 2 to Lowell Johnson in 1991, it was with the express understanding that the sale did not include the Gap.

In 1988, McKheen and the defendants each rented their respective parcels to Thomas Creek Farms, which used the Gap road for access to both parcels and also used water from the well to irrigate both parcels. In 1990, the road was plowed under to allow Thomas Creek Farms to "farm [both lots] as one." From that time until the plaintiffs bought Parcel 2 in 2001, both parcels and the Gap were farmed as one field by the various lessees of both parcels.

Shortly after plaintiffs purchased Parcel 2, they converted Parcel 2 to pasture, parked a motor home in the northern portion of the Gap, and began constructing a fence along the west edge of the Gap. Defendants objected to the plaintiffs' fence and attempted to put up their own fence along the east edge of the Gap. In response, plaintiffs filed this lawsuit.

Plaintiffs alleged a number of claims against defendants and the Jones heirs, seeking, *inter alia*, (1) title to the Gap on the basis of adverse possession and (2) a prescriptive easement across Parcel 1 for the power line to the well. Defendants' answer contained three counterclaims, each styled as both a counterclaim against plaintiffs and a "crossclaim against * * * the heirs and assigns of J.L. Jones."[3] The first counterclaim alleged adverse possession of the Gap and well by virtue of "the mutual use of the gap and well by the Defendants Tilley and Plaintiffs," with the result that "J.L. Jones and his successors do not have any rights in the gap or well." The second and third counterclaims sought a declaration and award—to both plaintiffs and defendants— of an "undivided one-half interest in the gap and the well" based on a theory of "non-exclusive, mutual use."[4]

---

[3] Plaintiffs' operative third amended complaint also includes claims for declaratory judgment, quiet title, conversion, intentional interference with business relations, and trespass. Although the trial court's general judgment did not specifically dispose of those claims, they are deemed to have been dismissed with prejudice. ORS 18.082(3) (describing effect of general judgment with respect to claims not expressly decided).

[4] Defendants' second counterclaim/cross-claim and third counterclaim/cross-claim incorporated the allegations of "mutual use" from their first counterclaim/cross-claim:

At trial, defendants clarified their position as being based on the theory that, although neither defendants nor plaintiffs could prove exclusive use of the property, "both have adverse[ly] possessed against the heirs of J.L. Jones" and that, as a result of that "mutual use * * * both parcel owners have the right to use the gap [and] the well." Plaintiffs, on the other hand, continued to assert their right to sole ownership of the Gap by virtue of adverse possession.

Initially, the trial court was unpersuaded that either plaintiffs or defendants were entitled to ownership of the Gap, either individually or jointly. Rather, the court concluded that ownership of the Gap had remained in J.L. Jones, and, based on the court's and the parties' belief that Jones had died "without any known heirs," the court determined that "neither Party can make claim to the property because with the death of Jones, the property escheated to the State and no adverse claim can be made against State property."

That determination, as presented in the trial court's first letter opinion, rested on a mistaken premise. After the court's letter opinion, but before entry of judgment, the state informed the court that escheat was impossible because Jones did, in fact, have heirs among whom his intestate estate had been distributed in probate. Plaintiffs subsequently located the successors-in-interest of Jones's heirs and obtained from them quitclaim deeds to the Gap. On the basis of those newly acquired quitclaim deeds, and still before

---

"The aforesaid gap and well were used on a non-exclusive, mutual basis by Defendants Tilley and their predecessors in interest and Plaintiff Harrell and her predecessors in interest, those parties being the property owners on both sides of the gap.

"No one party used the gap property or the subject well exclusively and in a hostile manner to the other party. The property owners of the common boundaries to the gap have always used the gap property and the subject well in a cooperative mutual basis for the benefit of their respective properties. The Court should award each party the right to an undivided one-half interest in the gap and the well.

"* * * * *

"* * * [T]he Court should declare that Plaintiffs have an undivided one-half interest in utilizing the gap and well, and Defendants Tilley have an undivided one-half interest in utilizing the gap and well, * * * and that neither party should obstruct the other party's right to use of the gap and well, and that the costs for use of the gap and well be equally shared between the parties."

entry of judgment, plaintiffs asked the court to reconsider its rejection of their quiet title claim.

In a second letter opinion, the trial court again rejected plaintiffs' alleged entitlement to sole ownership of the Gap. Specifically, the court concluded that plaintiffs' newly acquired quitclaim deeds conveyed no ownership interest because, long before plaintiffs had obtained those deeds, plaintiffs' and defendants' predecessors-in-interest had acquired joint title to the Gap through "joint adverse possession":

> "The Court [in its first letter opinion] had made two decisions[:] First, there was the required acts for adverse possession, and second, there were no heirs to adversely possess against. The second one was wrong. There are heirs to adversely possess against. The adverse possession took place before the Plaintiff[s] got the deeds. Therefore, the adverse possession was completed. The Parties jointly have adverse possession."

The court subsequently entered judgment granting each party "a joint interest" in the Gap and allowing defendants "to file within this case an action for partition to divide the land between the parties." Plaintiffs appeal from that judgment.

On appeal, plaintiffs raise several arguments for awarding them sole ownership of the Gap, as well as a prescriptive easement across defendants' property for the power line running to the well.[5] Defendants counter that the trial court properly recognized the parties' "joint interest" in the Gap as a result of both parties' "mutual adverse possession" and that, at the very least, the parties' cooperative use of the Gap precludes plaintiffs' adverse possession claim.

---

[5] Plaintiffs also claim that the court's award to defendants of a joint right to the water from the well in the Gap is unlawful under state water law. Because the Department of Water Resources (DWR) has primary jurisdiction over groundwater appropriation and water rights, and because proceedings involving the water rights associated with this well are presently pending before DWR, we decline to address the merits of that issue. *See generally Ashland Drilling, Inc. v. Jackson County*, 168 Or App 624, 629-31, 4 P3d 748, *rev den*, 331 Or 429 (2000) (requiring exhaustion of administrative remedies before this court may assert jurisdiction over groundwater rights).

■■ We begin with plaintiffs' adverse possession claim. To establish ownership by adverse possession, plaintiffs must prove by clear and convincing evidence that, for a ten-year period, they or their predecessors maintained actual, open, notorious, exclusive, hostile, and continuous possession of the property. *See Hoffman v. Freeman Land and Timber, LLC.*, 329 Or 554, 559, 994 P2d 106 (1999) (stating requirements of adverse possession claim).[6] We conclude that plaintiffs have failed to establish the required element of hostility by clear and convincing evidence.

Plaintiffs' claim relies on the actions of their predecessor-in-interest, E.O. Kerr. Between 1938 and approximately 1959, as the owner of Parcel 2, Kerr used the Gap as a driveway for access to his residence on Parcel 2 and rented the arable land to tenant farmers. Those farmers—namely the Jacobsons—also used the Gap road for access to the fields located on Parcel 2. That is the only evidence of any party's exclusive use of the Gap before 1956. From that evidence, we conclude that Kerr's use of the Gap during that period was open, notorious, and continuous for a period of at least ten years.

■ Nevertheless, plaintiffs' adverse possession claim based on Kerr's use of the Gap fails for lack of proof of the element of hostility. To establish that element, adverse possession claimants must demonstrate, by clear and convincing evidence, either that their possession—or, as in this case, their predecessor's possession—of the disputed property was under an "honest but mistaken belief of ownership," *Hoffman*, 329 Or at 561 n 4, or that the possessors held "a subjective intent to possess the property intending to be its owner and not in subordination to the true owner." *Id.* at 561 (internal quotation marks omitted); *see also Nedry v.*

---

[6] In 1989, the legislature enacted ORS 105.620, which requires that, to establish an adverse possession claim, defendants must establish, in addition to the common-law elements stated above, that their possession was under an honest belief that they owned the disputed parcel, that their belief continued through the vesting period, and that their belief had an objective basis and was reasonable under the circumstances. However, ORS 105.620 applies only to claims for which the period of adverse possession extends beyond January 1, 1990. The statute therefore does not apply in this case. *See* Or Laws 1989, ch 1069, § 4; *Mid-Valley Resources, Inc. v. Engelson*, 170 Or App 255, 259 n 2, 13 P3d 118 (2000), *rev den*, 332 Or 137 (2001).

*Morgan*, 284 Or 65, 70-71, 584 P2d 1381 (1978) (hostility element requires court to inquire into subjective intent of claimant); *Norgard et al v. Busher et ux*, 220 Or 297, 301, 349 P2d 490 (1960) ("Where an occupant of land is in doubt as to the location of the true line[,] it is reasonable to inquire as to his state of mind in occupying the land in dispute."); *Mid-Valley Resources, Inc. v. Engelson*, 170 Or App 255, 260, 13 P3d 118 (2000), *rev den*, 332 Or 137 (2001) (describing permissible means of establishing hostility). Hostility may not be presumed from the fact that the disputed property was used openly and continuously for the requisite ten-year period. *Hoffman*, 329 Or at 562. In the absence of affirmative proof of either "pure mistake" or subjective intent to possess, Oregon law presumes that even open, notorious, continuous, and exclusive possession is still subservient—and therefore not adverse—to the legal title. *Id.* at 561 (quoting *Laurance v. Tucker*, 160 Or 474, 484, 85 P2d 374 (1938)).

*Mid-Valley Resources, Inc.,* illustrates that requirement. There, the claimant had acquired property from her parents that was located immediately east of the disputed parcel. However, the claimant testified that she "did not know" whether a fence running along the west side of the disputed parcel was the boundary of her family's property, that "her parents never talked about where the property line was," and that "as a child living on the property she did not know where the boundary line to her parents' property was * * *." *Id.* at 261. In evaluating whether that testimony sufficed to place the case within the "pure mistake" doctrine, we explained that an adverse possessor must possess the disputed property under an honest belief that the property is covered by his or her deed and that any uncertainty or conscious doubt as to the location of the relevant property line precludes a finding of pure mistake. *Id.* at 261 (citing *Norgard*, 220 Or at 301). Accordingly, we found that, because the claimant could not state affirmatively that she believed the disputed property to be owned by her parents before her, there was "no evidence that the [claimant] mistakenly believed [she] owned the disputed parcel * * *." *Id.* at 260-61.

Given the absence of any evidence of pure mistake in *Mid-Valley Resources, Inc.*, we then addressed the question of

whether the claimant subjectively intended to possess the disputed tract as its true owner. Although the claimant's predecessors had maintained a fence along the western edge of the disputed parcel, we found, based on other evidence in the record, that the purpose of the fence was "to border [a] road, not to establish [claimant's] property line." *Id.* at 262. In the absence of any other "persuasive evidence of intent to possess the property as a true owner," we concluded that the claimant had failed to establish hostility by clear and convincing evidence. *Id.*

Here, plaintiffs offer nothing but conjecture as to either Kerr's actual knowledge or his subjective intent regarding ownership of the Gap. There is no evidence that Kerr believed, albeit mistakenly, that he did own the Gap.[7] Nor is there any evidence that Kerr intended to wrest ownership from its true owners by using the Gap road. Indeed, on this record it is just as likely that Kerr knew his deed did not include title to the Gap but believed that the road traversing the Gap was open to the public and, consequently, that his use was permissive. Such a scenario would not constitute hostile possession. *Hoffman,* 329 Or at 561 (citing *Robinson v. Leverenz,* 185 Or 262, 278, 202 P2d 517 (1949)).[8] In the absence of clear and convincing evidence of either pure mistake or subjective hostile intent, we cannot find that Kerr's use of the Gap was hostile to the interests of the record title holder, Jones and his heirs. *Hoffman,* 329 Or at 561-62; *Faulconer v. Williams,* 327 Or 381, 390-91, 964 P2d 246 1998); *Mid-Valley Resources, Inc.,* 170 Or App at 259-60.

■■ As an alternative basis for establishing title to the Gap, plaintiffs suggest that they are entitled to sole ownership by virtue of the default order they obtained against the

---

[7] Kerr's use of the Gap road for access to his property does not, by itself, constitute clear and convincing evidence that he believed himself to be the owner of that road. Again, there is no evidence that Kerr built, or even maintained, that road. *See* 201 Or App at 468. Indeed, the record does not disclose when, by whom, or for what purpose the road was initially built. *Id.*

[8] In *Hoffman,* for example, the court noted that evidence of conversations between the claimant and the true owner of the disputed property "about trading [claimant's] other ranch property for [the disputed parcel]" suggested that claimant "was aware during the relevant 10-year period that he did not own the property" and that his use of it was not hostile. 329 Or at 563.

Jones heirs, which was entered in September 2002. That default order, while precluding the Jones heirs from participating in this litigation, did not finally and adversely adjudicate the merits of plaintiffs' claims against the Jones heirs. That is, the default order against the Jones heirs was never reduced to judgment. ORCP 69 B(2).[9] Rather, as noted, the trial court ultimately rejected the merits of plaintiffs' adverse possession claim against defendants—which rested on the same factual predicates as plaintiffs' allegations against the Jones heirs. Where a defaulting defendant occupies the same legal position as a codefendant who appeared and prevailed on the merits, as did the Tilleys here with respect to plaintiffs' claim for sole adverse possession, entry of judgment *in favor of* the defaulting party on that claim is appropriate. *Brooks v. Ballew,* 95 Or App 381, 382, 768 P2d 941 (1989); *see also McCarvill v. McCarvill,* 144 Or App 437, 441 n 4, 927 P2d 115 (1996) (stating that, although it need not decide the issue in the case before it, a trial court may, in proper circumstances, "properly dismiss the case" against a defaulting defendant prior to entry of default judgment "because plaintiff's evidence does not support his allegations"). Accordingly, plaintiffs' present reliance on the default order against the Jones heirs is unavailing.

■    We thus conclude that plaintiffs are not entitled to sole ownership of the Gap either by virtue of adverse possession by Kerr or by virtue of the default order they obtained against the Jones heirs. The question remains, however, whether plaintiffs *might* be entitled to possession by virtue of the quitclaim deeds they ultimately obtained from the Jones heirs. *See* 201 Or App at 471. Whether those deeds could convey title to the Gap depends, in turn, on whether—as the trial court determined—"joint adverse possession" by both defendants' and plaintiffs' predecessors-in-interest somehow deprived the Jones heirs of record title. Accordingly, we turn to that question.

---

[9] ORCP 69 B(2) governs entry of default judgments in cases other than those "aris[ing] upon contract" and provides, in part, that "the party seeking judgment must apply to the court for judgment by default." There is no indication in the record that plaintiffs ever applied for judgment by default against the Jones heirs.

■ Since 1956, neither plaintiffs, defendants, nor their predecessors exercised the kind of exclusive use required to acquire ownership by adverse possession. Oregon's law of adverse possession uniformly requires a degree of exclusive possession characteristic of that which an owner of the property would exercise. *Hoffman*, 329 Or at 560; *Russell v. Gullett*, 285 Or 63, 67, 589 P2d 729 (1979). That standard affords claimants the freedom to allow others to occasionally use their property, in the manner that neighbors are wont to do, without thereby abandoning their claim to adverse possession. Moreover, even when such use rises to the level of equal use by the claimant and others, the required element of exclusivity is not satisfied. *Werner v. Brown*, 44 Or App 319, 324-25, 605 P2d 1352, *rev den*, 289 Or 71 (1980). The use made of the Gap from 1956 onward was insufficiently exclusive by any one party to wrest possession and ownership from the record title holders.

Defendants argue, nonetheless, that this court should recognize a species of adverse possession adopted by the Texas Court of Civil Appeals in *Anzaldua v. Richardson*, 287 SW2d 299 (Tex Civ App 1956). In that case, two brothers, Urbano and David Anzaldua, jointly entered into grazing land as trespassers. Together the Anzaldua brothers fenced the land in question, paid taxes and expenses, and "used it continuously under a claim of right * * * and claimed the land together as co-tenants" for the statutory period. 287 SW2d at 300. The court identified the legal question presented as "whether two persons, acting in concert" can acquire joint title by adverse possession. *Id.* The court answered that question in the affirmative.

In so holding, the Texas court emphasized the precise nature of the claim before it as one of "joint possession" and a "joint claim." *Id.* That characterization distinguished the Anzaldua brothers' claim from cases rejecting adverse possession claims because of lack of exclusivity where "one person, jointly in possession with another, asserts title to the entire tract, on behalf of himself, as against the true owner." *Id.* The court also cited as authority for its conclusion a number of Texas cases recognizing that "[t]wo or more persons may jointly claim and may jointly possess lands without destroying the exclusive nature of their possession" where

the claimants are "acting together" either as "joint tenants or tenants in common," as an "unincorporated association * * * act[ing] in concert," as husband and wife, or as family members "jointly claiming and possessing lands." *Id.* at 301.

Even assuming, without deciding, that a claim of "joint adverse possession" could be cognizable under Oregon law, under the circumstances analogous to those in *Anzaldua*,[10] the circumstances here were materially different from those in that case. Here, plaintiffs' and defendants' predecessors were not "acting in concert," either as business partners, cotenants, individual family members acting on behalf of the family as a whole, or through any other legally recognized relationship. Here, by contrast, the parties each used the Gap for access to, and the well to irrigate, their own separate parcels. Although that use was nonexclusive as to each party, it was not joint, in the sense of acting together for a common purpose.

The absence of joint use not only distinguishes this case from *Anzaldua* but also, and far more importantly, renders this case indistinguishable from *Werner*. In *Werner*, a quiet title action, defendant and another neighboring landowner had both run livestock on accreted land adjacent to the plaintiffs' property. The trial court concluded that the plaintiffs were entitled to the disputed parcel "as the riparian owners of the land to which the disputed parcel accreted," and, in doing so, rejected the defendant's countervailing assertion of adverse possession. *Id.* at 323. We affirmed, holding that, given that the defendant's and the third party's concurrent but independent use of the property was, necessarily, nonexclusive, the defendant could not establish the requisites of adverse possession. *Id.* at 324 ("The requirement of exclusive use is not met when two or more persons are in possession of the property."). That reasoning is dispositive here. Accordingly, the trial court erred in entering judgment for defendants on their counterclaim and cross-claim for joint adverse possession through mutual use.[11]

---

[10] *Cf. Werner*, 44 Or App at 324 n 2 ("We need not decide whether two or more persons may establish joint title to land by adverse possession if they jointly possessed the property for the requisite period under circumstances which meet the test.").

[11] The parties' and their predecessors' use of the disputed strip might be consistent with a finding of mutual, nonexclusive prescriptive easements over, and to,

Our disposition in that regard requires remand for reconsideration of the trial court's rejection of plaintiffs' quiet title claim. As noted, after the trial court's initial letter opinion, but before the entry of judgment, plaintiffs obtained quitclaim deeds from the Jones heirs. *See* 201 Or App at 471. They then proffered the quitclaim deeds in support of their quiet title claim. The trial court, however, determined that any reliance on those deeds was unavailing, given the "joint adverse possession" of the Gap; that is, that "joint adverse possession" had deprived the Jones heirs of any interest in the Gap, so the quitclaim deeds conveyed nothing.

The "joint adverse possession" premise of the trial court's treatment of the quitclaim deeds was erroneous. Accordingly, we reverse the trial court's judgment against plaintiffs' quiet title claim and remand for it to reconsider the legal effect of plaintiffs' belatedly acquired quitclaim deeds.[12]

■ We turn, finally, to plaintiffs' claim for a prescriptive easement over Parcel 1 for the purpose of the electrical power line running to the well. There is no evidence or testimony as to the circumstances surrounding the installation of the power pole or line running from the well in the Gap across Parcel 1. However, it is clear that, since the well was installed, the owners of both Parcels 1 and 2 shared in its use and, consequently, in the advantages attendant to having the power line strung across defendants' property to the well. On the basis of that evidence, we infer that the use of defendants' property for this purpose was permissive—and, in fact, may have been contingent upon defendants' predecessors having continuing use of the well. Such permissive use bars a finding of easement by prescription. *See Kondor v. Prose*, 50 Or App 55, 60, 622 P2d 741 (1981). Consequently, the trial court correctly rejected plaintiffs' claim for a prescriptive easement for power line purposes over defendants' land.

---

the Gap for farming and for gaining access to their respective deeded lots, and to the well located in the Gap. However, neither party pleaded prescriptive easement rights to the Gap. Accordingly, given the pleadings, neither we nor the trial court can award such usufructory rights. *Shumate v. Robinson*, 52 Or App 199, 203, 627 P2d 1295 (1981) (court may not award a prescriptive easement where the pleadings "claimed only ownership of the property").

[12] In so holding, we imply no view as to whether those deeds are, in fact, sufficient to convey any interest in the Gap to plaintiffs.

Reversed and remanded for consideration of plaintiffs' quiet title claim; reversed on defendants' counterclaims and cross-claims for mutual use and declaratory judgment; otherwise affirmed.